**BOARD OF PUBLIC INSTRUCTION OF TAYLOR COUNTY, FLORIDA, Petitioner,**

v.

**Robert H. FINCH, Secretary of Health, Education and Welfare, Respondent.**

**No. 26841.**

United States Court of Appeals
Fifth Circuit.
Aug. 12, 1969.

---

Don Dansby, Perry, Fla., for appellant.

David L. Rose, David B. Marblestone, Civil Rights Division, Dept. of Justice, Washington, D. C., Edward F. Boardman, U. S. Atty., Tampa, Fla., Clinton Ashmore U. S. Atty., Tallahassee, Fla., Jerris Leonard, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for appellee.

Before BELL and GOLDBERG, Circuit Judges, and ATKINS, District Judge.

GOLDBERG, Circuit Judge:

Nominally, this case involves a challenge to the validity of an order by the Department of Health, Education and Welfare (HEW) terminating the payment of federal funds to the Board of Public Instruction of Taylor County, Florida, for violating Title VI of the Civil Rights Act of 1964.[1] Underlying this challenge, however, is a broader question concerning the character and reach of the limitations which Congress has placed upon the power of an administrative agency to cut off federal funds and the Congressional policy behind such limitations.

The facts of this case are undisputed. Appellant, the Board of Public Instruction of Taylor County, Florida (hereafter the School Board, operates a small district of eight public schools attended in recent years by approximately 2900 white students and 975 Negro students. Prior to the 1965–1966 school year, the Board maintained these schools on an entirely segregated basis. No white child attended class with any Negro child and no Negro child attended class with any white child.

Following the passage of the Civil Rights Act of 1964, the School Board adopted a "freedom of choice" plan and submitted it to the Commissioner of Education for approval. The plan was accepted by the Commissioner on July 26, 1965, as complying with the Civil Rights Act, the regulations issued thereunder, and the HEW policy statement known as the Guidelines. In March of 1966, following the issuance by the Commissioner of a Revised Statement of Policies for School Desegregation Plans, the School Board submitted to the Office of Education an assurance of compliance with the revised policies. Thereafter the School Board complied with the formal requirements of the original and revised Guidelines for the adoption of a freedom of choice plan, i. e., the notification of parents and students, the giving of public notice, etc., but did not, in HEW's view, comply with the Guideline requirements specifying an acceptable pace of desegregation. The record tends to confirm HEW's position.

In 1965–1966, approximately 10 Negro students attended certain of the formerly all-white schools, and no white student attended the one Negro school in the district. In February, 1967, only 38 Negro students (representing less than 4% of the Negro student population) were attending formerly all-white schools, and again no white student was in attendance at the Negro school. During both years the faculties in all schools were entirely segregated with the sole exception of a librarian who was assigned across racial lines. For the school year 1967–1968, School Board officials eventually agreed to the transfer of 74 Negro students and the assignment of 4 teachers across racial lines, but these concessions were well below the Guideline requirements. The Guidelines called for the transfer of 12% of the Negro students and the reassignment of at least 16 teachers.

Beginning in February of 1967, there began a series of meetings between representatives of HEW and school officials for the purpose of procuring voluntary compliance with the Guidelines. The meetings continued through the month of June, but finally ended when further

---

I. Title VI, § 601 (42 U.S.C.A. § 2000d):
No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

negotiations appeared fruitless. The Commissioner of Education then advised the Board by letter that he was referring the matter to the HEW General Counsel for the initiation of administrative proceedings.

After a period of delay agreed upon by both sides, hearings were held on January 16 and January 17, 1968. On April 4, 1968, the HEW hearing examiner ruled that the Taylor County School Board was in violation of Title VI of the Civil Rights Act and no longer entitled to federal funds. He found that the School District's "progress toward student desegregation was inadequate," that it "had not made adequate progress toward teacher desegregation," and that the District was "seeking to perpetuate the dual school system through its construction program." Based on these findings, the examiner entered an order terminating "any classes of Federal financial assistance" to the Taylor County School District "arising under any Act of Congress" administered by HEW, the National Science Foundation, and the Department of the Interior until such time as the School District corrected its noncompliance with the Act.[2] On June 26, 1968, the HEW Reviewing Authority adopted this order along with the opinion of the hearing examiner after slight modifications not pertinent here. The order terminating funds to the District became operative on September 13, 1968. Its effect was to cut off all federal funds from the Taylor County School District in the following amounts and under the following Congressional grant statutes:

Title II, Elementary and Secondary Education Act of 1965, 20 U.S.C.A. §§ 241a–m (Supp., 1969):

$99,622.20

Title III, Elementary and Secondary Education Act of 1965, 20 U.S.C.A. §§ 841–848 (Supp., 1969):

$102,035.35

Public Law 89–750, Basic Education for Adults, 20 U.S.C.A. §§ 1201–1213 (Supp., 1969):

$2,000.00

Following the decision of the HEW Reviewing Authority, the Taylor County School Board sought review in the United States District Court for the Northern District of Florida, Parker v. Cohen, Tallahassee Civ. Action No. 1440. On September 24, 1968, the district court dismissed the action, holding that under the review provisions of the relevant grant statutes, see 20 U.S.C.A. § 241k, 20 U.S.C.A. § 844a(e) (3), 20 U.S.C.A. § 1207(b) (Supp., 1969), exclusive jurisdiction was in the court of appeals. See also 42 U.S.C.A. § 2000d–2 and 5 U.S.C.A. § 703, formerly 5 U.S.C.A. § 1009 *Cf.* Gardner v. State of Alabama, Dept. of Pensions & Security, 5 Cir. 1967, 385 F.2d 804, 810, cert. denied, 389 U.S. 1046, 88 S.Ct. 773, 19 L.Ed.2d 839. This action was then initiated.

## I.

Two questions are tendered for consideration on this appeal. Petitioner

---

2. The complete order finally adopted by HEW reads as follows:

ORDER

IT IS ORDERED that Federal financial assistance administered by: The Department of Health, Education, and Welfare; the National Science Foundation; and the Department of the Interior be terminated and refused to be granted or continued, with respect to any classes of Federal financial assistance arising under any Act of Congress administered by them, to respondent School District and to respondent State Agency for use in any school program or activities conducted by respondent School District; and that said refusal to grant and to continue Federal financial assistance shall remain in force until respondent School District corrects its noncompliance with the requirements imposed by or pursuant to the Civil Rights Regulations and satisfies the responsible officials of the aforementioned Departments and Agencies that it will in the future fully comply with all applicable requirements imposed by or pursuant to the aforementioned Regulations.

asks us to consider whether the order entered by HEW in the proceedings below violates 42 U.S.C.A. § 2000d–1 (§ 602, Title VI) of the Civil Rights Act. That statute provides in relevant part that the termination of federal financial assistance shall be limited to programs or parts thereof found not in compliance with the Act:

" * * * Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, *shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found * * *.*" [Emphasis added.]

The record shows that none of the findings of the HEW hearing examiner or of the HEW Reviewing Authority are programatically oriented, at least if the term "program" is understood to refer to the individual grant statutes under which aid was given to the Taylor County School District. It is also plain on the face of the order entered by HEW that the termination of federal funds is not "limited in its effect" to one or more of the federally financed activities described in the grant statutes, but extends to "any classes of Federal financial assistance arising under *any Act of Congress. * * *"* [Emphasis added.] Petitioner asks us to vacate the HEW order as a plain violation of the statute.

HEW argues that we must reject Petitioner's argument, not only on its merits, but because it was not raised at the administrative proceedings below. HEW contends that a question raised for the first time on this appeal is not properly before us.

After carefully considering the arguments on both sides, we are persuaded that this case must be reversed and remanded to HEW for further proceedings not inconsistent with this opinion.

## II.

We first consider HEW's argument that the issue of statutory noncompliance is not properly before us. The general rule of appellate review from decisions of an administrative agency is "that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." United States v. L. A. Tucker Truck Lines, Inc., 1952, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54, 58. It has even been said that "A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented * * *." Unemployment Comp. Com. v. Aragon, 1946, 329 U.S. 143, 154, 67 S.Ct. 245, 251, 91 L.Ed. 136, 145. But the rule is not inflexible.

" * * * There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below. See Blair v. Oesterlein Machine Co., (1927) 275 U.S. 220, 225, 48 S.Ct. 87, 72 L.Ed. 249.

"Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with this policy. Orderly rules of procedure do not require sacrifice of the rules of fundamental justice." Hormel v. Helvering, 1941, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037, 1041.

In our view the circumstances of this case more nearly fit the exception than the general rule. See Ward v. Anderson 1953, 93 U.S.App.D.C. 156, 208 F.2d 48, 50; Mulligan v. Andrews, 1954, 93 U.S.App.D.C. 375, 211 F.2d 28, 29; United States v. Latrobe Construction Company, 8 Cir. 1957, 246 F.2d 357, 362, cert. denied, 355 U.S. 890, 78 S.Ct. 262, 2 L.Ed.2d 189; Leedom v. International Brotherhood of Elec. Workers, 1960, 107 U.S.App.D.C. 357, 278 F.2d 237, 244; Stouper v. Jones, 1960, 109 U.S.App.D.C. 106, 284 F.2d 240, 243–244 (dissenting opinion); Morgan v. Garris, 1962, 113 U.S.App.D.C. 222, 307 F.2d 179, 180, 181; Wirtz v. International Harvester Company, 5 Cir. 1964, 331 F.2d 462, 465–466, cert. denied, 379 U.S. 845, 85 S.Ct. 36, 13 L.Ed.2d 50; Pritchard v. Liggett & Myers Tobacco Company, 3 Cir. 1965, 350 F.2d 479, 486, cert. denied, 382 U.S. 987, 86 S.Ct. 549, 15 L.Ed.2d 475; United States v. Feinberg, 3 Cir. 1965, 372 F.2d 352, 363; McKissick v. United States, 5 Cir. 1967, 379 F.2d 754, 759; Youngstown Sheet and Tube Co. v. Lucey Products Co., 5 Cir. 1968, 403 F.2d 135, 139. We deal here with the action of an administrative agency that is (1) in excess of statutory authority, cf. Leedom v. Kyne, 1958, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210, (2) likely to result in individual injustice, Hormel v. Helvering, supra, (3) disruptive of the legislative scheme, cf. Elgin, Joliet & Eastern R. R. Co. v. Benj. Harris & Co., N.D.Ill. 1965, 245 F.Supp. 467, 472, and (4) contrary to an important public policy extending beyond the rights of the individual litigants, cf. Wirtz v. International Harvester Company, supra, at 465.

We do not believe that appellate review in the above circumstances is inconsistent with United States v. L. A. Tucker Truck Lines, supra. While not discussing the rule in Hormel,[3] the Tucker court did emphasize that the agency action there under review was clearly not prejudicial to the appellant.[4] We detect in this emphasis considerable reluctance on the part of the Supreme Court to abandon the now familiar principle that "Rules of practice and procedure are devised to promote the ends of justice, not to defeat them." Hormel v. Helvering, supra, 312 U.S. at 557, 61 S.Ct., at 721.

The facts of the present case make it impossible for this court to determine

**3.** See 3 Davis, Administrative Law Treatise, Section 20.06 (1958 ed), p. 96:

"The problem of the Tucker case is in essence the same as the problem of the Hormel case, for the key fact about both cases is that the basis for challenge of the administrative action was a decision of the Supreme Court handed down after the administrative proceeding had terminated. The Court penetrated the problem a good deal further in the Hormel opinion and may have reached a sounder conclusion. Yet none of the three Tucker opinions mentioned the Hormel case."

**4.** United States v. L. A. Tucker Lines, 344 U.S. at 35–36, 73 S.Ct., at 68:

"Appellee did not offer nor did the court require any excuse for its failure to raise the objection upon at least one of its many opportunities during the administrative proceeding. Appellee does not claim to have been misled or in any way hampered in ascertaining the facts about the examiner's appointment. It did not bestir itself to learn the facts until long after the administrative proceeding was closed and months after the case was at issue in the District Court, at which time the Commission promptly supplied the facts upon which the contention was based and sustained.

"The apparent reason for complacency was that it was not actually prejudiced by the conduct or manner of appointment of the examiner. There is no suggestion that he exhibited bias, favoritism or unfairness. Nor is there ground for assuming it from the relationships in the proceeding. He did not act and was not expected to act both as prosecutor and judge. The Commission, which appointed him, did not institute or become a party in interest to the proceeding. Neither it nor its examiner had any function except to decide justly between contestants in an adversary proceeding. The issue is clearly an afterthought, brought forward at the last possible moment to undo the administrative proceedings without consideration of the merits and can prevail only from technical compulsion irrespective of considerations of practical justice."

whether or not petitioner has been prejudiced by HEW's failure to make findings of fact tailored to particular federal programs. Three separate and distinct federal programs are here involved. One concerns federal aid for the education of children of low income families;[5] one involves grants for supplementary educational centers;[6] the third provides special grants for the education of adults who have not received a college education.[7] Each of the programs has a different objective; each requires a separate plan and separate administrative approval;[8] and each has an individual provision for appellate review.[9] Under these circumstances it is not possible to say on the basis of segregation of faculty and students that all programs in the schools in Taylor County are constitutionally defective. It is perfectly possible that the federal grant for supplementary educational centers would have been used for a facility entirely separate from the rest of the school system.[10] It is also possible that the grant for adult educational classes supported a program that was administered in an entirely desegregated manner even if the elementary and high school classes were not. HEW's failure to make findings of fact

on these issues has deprived this court of the means with which to properly discharge its reviewing function. In order to affirm HEW's action, we would have to assume, contrary to the express mandate of 42 U.S.C.A. § 2000d–1, that defects in one part of a school system automatically infect the whole. Such an assumption in disregard of statutory requirements is inconsistent with both fundamental justice and with our judicial responsibilities. As one court has recently noted:

"The authority of an administrative agency is delineated by the terms of the statutory grant. The responsibility for construing the statutory authority rests with the judiciary. Hence, an inquiry to determine if the agency has exceeded its statutory power is a constitutional obligation of the courts. The refusal to apply the agency ruling upon finding that the bounds laid down by Congress have been traversed is not based on evidentiary insufficiency or disagreement with expert judgment, but is an exercise of judicial authority to preserve the legislative scheme." Elgin, Joliet & Eastern R. R. Co. v. Benj. Harris &

5. 20 U.S.C.A. § 241a.

6. 20 U.S.C.A. § 841.

7. 20 U.S.C.A. § 1201.

8. 20 U.S.C.A. § 241e(c)(1), 20 U.S.C.A. § 844, 20 U.S.C.A. § 1205.

9. 20 U.S.C.A. § 241k, 20 U.S.C.A. § 844a (e)(3), 20 U.S.C.A. § 1207(b).

10. It has been stipulated that:
"* * * *
c. The application which had been submitted under Title III of the Elementary and Secondary Education Act related to the Resource-Use Outdoor Education Center, Perry, Florida. The only evidence in the record concerning the Center was submitted by the Board, i. e., the following testimony of Superintendent Hart (Transcript, pp. 146–147):
Q. [by counsel for the Board] What is the Resource Youth [sic] Outdoor Education Center which is planned for Taylor County?

A. It is an innovative program which is designed to do several things. One is to provide opportunity for teachers and pupils to use a natural setting where there are forests and a stream, a spring, different kinds of animals and birds for an outdoor laboratory. When completed we hope to hold workshops there for teachers who are teaching conservation. Also we plan to use it for visits by the day or two or three days by classes in Taylor County and in five surrounding counties.
Q. Is it desegregated?
A. Of course, we have not yet begun to start the operation of it.
Q. Will it be?
A. It will be desegregated, yes. It's in the building phase right now."
It has also been stipulated that:

"d. No evidence was offered concerning use of the funds granted for adult basic education."

Co., N.D.Ill. 1965, 245 F.Supp. 467, 472.

■ The action of HEW in the proceedings below was clearly disruptive of the legislative scheme. The legislative history of 42 U.S.C.A. § 2000d–1 (§ 602 of the Act) indicates a Congressional purpose to avoid a punitive as opposed to a therapeutic application of the termination power.[11] The procedural limitations placed on the exercise of such power were designed to insure that termination would be "pinpoint(ed) * * * to the situation where discriminatory practices prevail." 1964 U.S. Code Cong. & Adm. News, p. 2512. As said by Senator Long during the Senate debate:

"Proponents of the bill have continually made it clear that it is the intent of Title VI not to require wholesale cutoffs of Federal Funds from all Federal programs in entire States, but instead to require a careful case-by-case application of the principle of nondiscrimination to those particular activities which are actually discriminatory or segregated." 110 Cong.Rec. 7103 (1964).

■ It is important to note that the purpose of limiting the termination power to "activities which are actually discriminatory or segregated" was not for the protection of the political entity whose funds might be cut off, but for the protection of the innocent beneficiaries of programs *not* tainted by discriminatory practices.[12]

11. See 110 Cong.Rec. 7062 (1964), where Senator Pastore noted:

"In the House, a concerted attack was made on title VI as 'punitive' or 'vindictive.' These charges are undeserved. These characterizations appear to result from the belief that title VI is intended to deny the South the benefit of social-welfare programs—that it would punish entire States for any act of discrimination committed within them. This argument merely befogs the issues. It ignores both the purpose of title VI and all of the limitations that have carefully been written into its language.

"As is clear, the purpose of title VI is to make sure that funds of the United States are not used to support racial discrimination."

See also 110 Cong.Rec. 7063 (1964):

"Moreover, as cannot be too often emphasized, the purpose of title VI is not to cut off funds, but to end racial discrimination. This requirement is reflected throughout the act. It is reflected in section 602, which provides that any action taken by the Federal department or agency must be 'consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.' As a general rule, cutoff of funds would not be consistent with the objective of the Federal assistance statutes if other effective means of ending discrimination are available.

"Section 602, by authorizing the agency to achieve compliance 'by other means authorized by law,' encourages agencies to find ways to end discrimination without refusing or terminating assistance. These careful safeguards certainly demonstrate that the proposed statute is not intended to be vindictive or punitive.

* * * * *

"There is, finally, one additional feature of title VI which demonstrates beyond doubt that it is not intended to be vindictive or punitive. I am referring to the fact that the authority contained in the title to cut off funds is hedged about with a number of procedural restrictions and requirements. These would hardly be necessary or appropriate if the bill were designed as a punitive or vindictive measure. * * *"

12. 110 Cong.Rec. 7061 (1964):

"Mr. PASTORE. That point was covered very ably by the distinguished Senator from Connecticut. A situation might occur in which there might be a hard core, pinpoint condition in a State which could not possibly be tolerated, but the situation in the remainder of the State might be good; the program in the remainder of the State might be administered on a nondiscriminatory basis. However, as the Senator from Connecticut said, not only could the rules and regulations that are promulgated by a nondiscriminatory agency cover that kind of situation, but I suppose that once title VI was enacted, in that particular case it would still be proper for the Attorney General under other titles of this bill, if he were asked to do so, to step in. He might go before the court and obtain some kind of injunctive relief or some kind of mandatory relief which would compel compliance subject to a citation for contempt

The very nature of such a purpose indicates that more than just the rights of one political entity are here involved. *Cf.* Wirtz v. International Harvester Co., *supra*, 331 F.2d at 465. The termination of federal funds affects the lives of persons not represented in the administrative proceedings below. For their protection, we may not regard the limitations on the termination power as mere procedural niceties peripheral to the purposes of the Act. Congressional history indicates that limiting the scope of the termination power was integral to the legislative scheme. 100 Cong.Rec. 7063. We cannot disregard this intention. Accordingly, we conclude that rules of procedural default are inappropriate to the circumstances of this case and that justice requires we reach and decide the merits of petitioner's claim.

### III.

There remain for consideration the various reasons offered by HEW for not reading 42 U.S.C.A. § 2000d–1 as imposing a requirement of programmatic specificity in all cases. In defense of its action at the administrative proceedings below, HEW argues: (1) the statute imposes no affirmative duty on HEW to make findings of fact for each program, but creates only affirmative defense for the School Board in the event that some programs are untainted, and (2) the term program in the statute does not re-

fer to individual grant statutes, but to general categories such as road programs and school programs. We find neither argument convincing.

The argument that the statute speaks not to the administrative agency terminating funds, but to the political entity whose funds are threatened, runs afoul of the language in the statute itself. The statute speaks to the "effect" of an order, not to its prerequisites. It states that termination "shall be limited *in its effect* to the particular program, or part thereof, in which such noncompliance has been so found." [Emphasis added.] The only party with the power to limit the effect of a termination order is the administrative agency into whose custody the funds for a particular program have been committed and by whom the order has been issued. This fact is made perfectly clear by the introductory words of the statute. The statute is directed to: "Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity * * *." It is not directed at any point to the political entity likely to be resisting the termination order. The statute is furthermore mandatory. A direction that termination *"shall* be limited" would be seriously inappropriate if the program limitation was a waivable defense committed to the uncertain skills and unpredictable tactics of those appearing before the agency.[13]

of court. We would not have to cut off assistance to 100 people because 1 person was being discriminatory in the administration of the money.

"Once the policy is set, there are many, many ways in which intervention could be had, so as not to do an injustice to a great multitude because of the instance of only one offender.

"We ought to make that very clear in the history we are making here today. We are not seeking to penalize people by way of pressure and saying that we can cure this one case if we twist the arms of 99 people. That is not the purpose of the section. We are not trying to bring compliance through pressure. We are trying to bring voluntary compliance. * * *"

13. The legislative history of 42 U.S.C.A. § 2000d–1, and particularly of the so-called Dirksen-Mansfield substitute (which introduced the program limitation) makes perfectly clear that the requirements of the statute are directed exclusively at the administrative agency:
See 110 Cong.Rec. 13126 (1964):
Mr. Gore.

\* \* \* \* \*

"As I have previously indicated to the Senate, it seemed clear to me that the use of the word 'may' would have the effect of authorizing alternate methods of implementing the provisions of section 601. Under the language of the bill, action might be taken to terminate Federal aid either by using the procedure specified in section 602, or by using some other

This fact is best appreciated in light of the statutory purposes already mentioned above. Limitations on the termination power are not primarily for the benefit of the political agency whose funds are withheld, but for the potential recipients of federal aid. To hold that HEW may deprive these persons of federal money because the state agency whose funds were threatened failed to assert an affirmative defense otherwise available would be 'to perpetuate. the very hardship the statutory limitations were designed to avoid. For this reason a construction of the statute which places the burden of limiting the effects of termination on the administrative agency responsible for the order appears more consonant with both the language and the purposes of the statute.

We must also reject HEW's interpretation of the term "program" as that term is used in the statute. While it is true as HEW points out that during the Senate debate on Section 602 of the Act (42 U.S.C.A. § 2000d–1) fears were expressed that termination of aid to schools might also lead to termination of aid to roads and highways, see 110 Cong.Rec. 7059 (1964); 110 Cong.Rec. 7067 (1964), such expressions of concern do not mark the *inner limits* of the term "program." In the first place, the statute requires that termination be limited "to the particular program, *or part thereof*" [emphasis added], found not in compliance with the Act. Even if "program" meant school program, as HEW contends, some meaning would have to be assigned to the parenthetical phrase, "or part thereof." The logical candidate would be the individual grant statutes which constitute the so-called "school program."

An even more substantial objection to HEW's interpretation of the term "program" is provided by the use of that term during Congressional debates on the statute and by HEW's own use of the term in the administrative regulations issued thereunder. In the Senate where the program limitation was initiated, reference was frequently made to the school lunch program, 110 Cong.Rec. 7101 (1964), to the agricultural extension program for home economics teachers, 110 Cong.Rec. 13126 (1964), to the farm-to-market road program, 110 Cong.Rec. 13331 (1964), to aid for vocational agriculture teaching, 110 Cong.Rec. 13126 (1964), and to aid to impacted school districts, 110 Cong.Rec. 7100 and 13126 (1964). Senator Eastland went so far as to introduce in the Congressional Record a long list of the federal programs to which the cutoff provision was applicable, 110 Cong.Rec. 8359–8361 (1964), as did Congressmen Poff and Cramer in the House. 1964 U.S. Code Cong. & Adm. News, pp. 2470–2473. HEW in issuing regulations to implement the cutoff provision has followed a similar procedure. See 45 C.F.R. § 80.2 and 45 C.F.R. § 80.13, Appendix A. All of these lists refer to particular grant statutes such as those before us, not to a collective concept known as *a* school program or *a* road program. Taken together they clearly contradict the notion that Congress intended the collectivization of all school subventions under the single rubric: "program or part thereof."

In line with this reasoning we note that each of the grant statutes involved

method which is not specified in the bill and not limited or restricted in any way.

"The revised language makes it clear that if the departments and agencies of the Federal Government described in section 602 take any action to withhold or terminate Federal financial assistance, such action must be taken in conformity with the so-called safeguard provisions outlined in section 602 and section 603.

"I hasten to add, however, that not all Federal aid programs are described or are

included in section 602. As I shall indicate in greater detail later, the revised language of the substitute does not resolve certain questions about the relationship between sections 601 and 602. It does, however, clear up in a manner satisfactory to me the ambiguity as to the type of procedure which the bill would require *the departments and agencies referred to in Section 602 to follow.*" [Emphasis added.]

in the case before us is denominated "a program" by the terms of its own statutory scheme.[14] It is perfectly clear from the differing objectives and requirements of these statutes that Congress perceived educational reform as a series of problems, each requiring its own remedial measures. Congress did not attempt a comprehensive "school program," but adopted instead a series of projects each intended to reach specific areas of educational need. That this was and had been the pattern of legislative reform was clear to the proponents of Title VI in the Senate. As noted by Senator Pastore, one of the functions of Title VI was to avoid the need for attaching a separate amendment to each Congressional bill prohibiting the use of funds in support of segregation. The clear import of the Senator's statement is that "program" and "bill" are interchangeable concepts.

"Another advantage of enactment of title VI would be to remove from the area of legislative debate the question of nondiscrimination every time a Federal assistance program is under consideration by Congress. Repeatedly, in recent years, nondiscrimination amendments have been proposed in Congress to bills providing for, or extending, Federal assistance to education, housing, and other matters. Such amendments have often been opposed by some Members of Congress who favored the principle of nondiscrimination, but feared that to raise the issue of discrimination in the particular legislative context might well result in the defeat of the particular bill.

"Title VI enables the Congress to consider the overall issue of racial discrimination separately from the issue of desirability of any particular Federal assistance program. The enactment of this title would avoid for the future the occasion for legislative

dilemmas of the type described above. It would also avoid any basis for argument that the failure of Congress to adopt such nondiscrimination amendments in connection with the particular program implied congressional approval of racial discrimination in that program." 110 Cong.Rec. 7062 (1964).

■■ We note finally that the purpose of the Title VI cutoff is best effectuated by separate consideration of the use or intended use of federal funds under each grant statute. If the funds provided by the grant are administered in a discriminatory manner, or if they support a program which is infected by a discriminatory environment, then termination of such funds is proper. But there will also be cases from time to time where a particular program, within a state, within a county, within a district, even within a school (in short, within a "political entity or part thereof"), is effectively insulated from otherwise unlawful activities. Congress did not intend that such a program suffer for the sins of others. HEW was denied the right to condemn programs by association. The statute prescribes a policy of disassociation of programs in the fact finding process. Each must be considered on its own merits to determine whether or not it is in compliance with the Act. In this way the Act is shielded from a vindictive application. Schools and programs are not condemned enmasse or in gross, with the good and the bad condemned together, but the termination power reaches only those programs which would utilize federal money for unconstitutional ends. Under this procedure each program receives its own "day in court."

IV.

■ We conclude with one word of caution. In finding that a termination of funds under Title IV of the Civil Rights Act must be made on a program by pro-

---

14. 20 U.S.C.A. § 844l provides:
   "The Commissioner shall carry out *a program* for making grants for supplementary educational centers and services * * *." [Emphasis added.]

See also 20 U.S.C.A. § 241l and 20 U.S.C.A. § 1205.

gram basis, we do not mean to indicate that a program must be considered in isolation from its context. To say that a program in a school is free from discrimination because everyone in the school is at liberty to partake of its benefits may or may not be a tenable position. Clearly the racial composition of a school's student body, or the racial composition of its faculty may have an effect upon the particular program in question. But this may not always be the case. In deference to that possibility, the administrative agency seeking to cut off federal funds must make findings of fact indicating either that a particular program is itself administered in a discriminatory manner, or is so affected by discriminatory practices elsewhere in the school system that it thereby becomes discriminatory. Only in this way can a reviewing court know that the effects of the order entered by the agency have been limited to programs not in compliance with the Civil Rights Act.

The order entered by HEW in the instant case is vacated, and the cause remanded to that agency for further proceedings not inconsistent with this opinion.