**Richard FOSS, Plaintiff,**

v.

**CITY OF CHICAGO, a municipal corporation; Louis Galante, City of Chicago Fire Commissioner; Charles Pounian, Commissioner of Personnel, Defendants.**

**No. 85 C 1394.**

United States District Court, N.D. Illinois, E.D.

Aug. 1, 1986.

---

Miriam N. Geraghty, Kinoy, Taren, Geraghty & Potter, Chicago, Ill., for plaintiff.

Darka Papushkewych, Victoria J. Sterling, Ass't Corp. Counsels, Chicago, Ill., for defendants.

Claire T. Hartfield, Friedman & Koven, Chicago, Ill., Council for Disability Rights, Inc., filed an amicus curiae brief in opposition to the motion.

## MEMORANDUM AND ORDER

MORAN, District Judge.

The Chicago Fire Department did not allow plaintiff Richard Foss to return to work following a blackout on the job and terminated him when his medical leave expired. Foss alleges that he is fully qualified for his job and so the Department's treatment of him is discrimination because of a handicap, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the State and Local Fiscal Assistance Act, 31 U.S.C. § 6721. The defendants have moved to dismiss on jurisdictional grounds. The only issue for the motion is whether the alleged discrimination is sufficiently related to a program or activity which receives federal financial assistance to trigger the protections of either statute. This court finds it is not and dismisses both claims.

## FACTS

Plaintiff describes his handicap as a "recurrent high grade ventricular arrythmia," and his status as a handicapped person is not disputed for purposes of this motion. Taking his allegations as true, he began work as a firefighter in 1967 and was promoted to engineer in 1973. After his loss of consciousness on the job in January 1984 he was placed on medical leave. The Fire Department's medical director refused to allow him to return to work, despite two letters from his treating physician authorizing his return. He is currently receiving heart-lung disability benefits.

After discovery, the parties agreed to a stipulation on federal financial assistance, which may be summarized as follows: The City of Chicago receives federal revenue sharing funds but none of these funds is allocated to the Chicago Fire Department. The Fire Department does, however, receive Federal Community Development Block Grant Funds for a First Aid Care Team (FACT) Program. That program, administered for the Department by Hull House Association, trains unemployed low income residents of a Chicago housing project in first aid skills and employs them as emergency medical technicians in the area of their project. Also, the City's Office of Emergency Preparedness and Disas-

ter Services (EPDS), which develops the City's disaster plan, is administratively part of the Fire Department. That office additionally maintains auxiliary firefighting equipment and trains volunteers to run it for use in very large fires. Its operations are 50 per cent reimbursed by Federal Emergency Management Assistance Funds. Foss had no duties relating either to FACT or EPDS. Each Chicago firefighter is covered by Federal Public Safety Officers Death Benefits, 42 U.S.C. § 3796, providing $50,000 to dependents if the fireman is killed in the line of duty. Firefighters who reach the rank of Fire Lieutenant or Paramedic Field Officer may apply to the National Fire Academy, established by 15 U.S.C. § 2206, for professional education and training. If successful, the training is provided at no cost to either the Department or the firefighter.

There are, therefore, three kinds of funding programs upon which the plaintiff relies. Through revenue sharing the City receives undesignated funds which it can commingle with its general revenues or which it, in its sole discretion, can earmark for particular programs. FACT and EPDS involve funds earmarked by the federal government and received by the City. Death benefits and education expenses are paid by federally designated funds but not to the City.

## DISCUSSION

### I. The Program-Specific Requirement

Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794, provides in relevant part:

> No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

Section 6716(b) of the State and Local Fiscal Assistance Act provides in relevant part:

> The following prohibitions and exemptions also apply to a program or activity of a State government or unit of general local government when the government receives a payment under this chapter: ... (2) a prohibition against discrimination against an otherwise qualified handicapped individual under section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794).

The Rehabilitation Act, like Titles VI and IX of the Civil Rights Act, does not reach all discrimination everywhere, but rather only discrimination "by federal grant recipients." *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 626, 104 S.Ct. 1248, 1250, 79 L.Ed.2d 568 (1984). Further, the ban on discrimination does not apply to all activities of every recipient of federal funds; rather, the ban is "program-specific," *i.e.,* the discrimination must relate to the federally funded program or activity. *Id.* at 635–636, 104 S.Ct. at 1255. Similarly, actionable discrimination under the Revenue Sharing Act is limited to discrimination in a program or activity that receives revenue sharing funds. *Dowdell v. City of Apopka,* 698 F.2d 1181, 1187 (11th Cir. 1983).

These requirements are necessary because neither the Rehabilitation Act nor the Revenue Sharing Act are statutes which have as a single goal bringing an end to discrimination like, for example, Title VII of the Civil Rights Act. Rather, the antidiscrimination sections of these statutes, like those of Title VI or Title IX of the Civil Rights Act, seek to strike a balance between the federal policy against discrimination and the various policy goals which give rise to federal funding. *See Iron Arrow Honor Society v. Heckler,* 702 F.2d 549, 557 (5th Cir.), *vacated as moot,* 464 U.S. 67, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983) (Titles VI and IX). As strong as the federal policy against discrimination is, Congress felt that the goals of other programs from school lunches to highway construction are also entitled to some weight.

Congress struck the balance at "an arrangement in the nature of a contract."

*United States Department of Transportation v. Paralyzed Veterans of America,* 477 U.S. ——, ——, 106 S.Ct. 2705, 2711, 91 L.Ed.2d 494 (1986). An entity which wanted federal financial assistance had to accept, as a price of that aid, that it could not use the aid for discriminatory ends. Conversely, if it wanted to discriminate, it had to do so without federal money. *Id. Cf. Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539–40, 67 L.Ed.2d 694 (1981). Ending discrimination was balanced with the needs of the "innocent beneficiaries" of the federal programs. *Iron Arrow,* 702 F.2d at 557; *Board of Public Instruction of Taylor County v. Finch,* 414 F.2d 1068, 1075 (5th Cir.1969). The result is not necessarily an end to discrimination, but it is what President Kennedy called "simple justice": "that public funds ... not be spent in any fashion which encourages, entrenches, subsidizes or results in ... discrimination." President's Second Civil Rights Message to Congress, June 19, 1963, quoted in *Iron Arrow,* 702 F.2d at 551.

The balance which Congress struck and the contractual nature of the arrangement explains the program-specific requirement. The statute was written to cover only situations where the federal assistance and the discrimination had a significant degree of contact with each other. Requiring a relationship between the discriminatory act and a federally funded "program or activity" was a way of ensuring that that degree of contact would be present. *Finch,* 414 F.2d at 1077. Under these statutes, the primary remedy for discrimination is agency action to cut off the federal funding. *Cf. Pennhurst,* 451 U.S. at 28, 101 S.Ct. at 1545. Congress felt that if the discrimination was unrelated or tangential to the goals of the funding, then the funding should go on. If the discrimination was in the federal program itself or supported by federal funds, or infected the federal program, then the policy against discrimination should prevail and funding should stop. *See Iron Arrow,* 702 F.2d at 562; *Finch,* 414 F.2d at 1078. The same considerations apply to the private right of action, and the definition of "program or activity" is the same whether the plaintiff is suing under § 504, Title VI or Title IX. *Darrone,* 465 U.S. at 636, 104 S.Ct. at 1255–56. *See also Brown v. Sibley,* 650 F.2d 760, 767–768 (5th Cir.1981) (similarity of anti-discrimination provisions of § 504, Title VI and Title IX).

## II. Characterizing the Program

Foss argues that for purposes of his claim the Chicago Fire Department should be characterized as a federally funded program or activity. It could have received revenue sharing funds, did receive funds for FACT and EDPS and benefits from the federal programs directed to firefighters. If the entire department is a federal program, then employment discrimination by the department would have the relationship to federal funds which § 504 requires. Defendants urge however that the specific use of the federal funds governs characterization of the relevant program or activity. They point out that no revenue-sharing funds reached the Fire Department, and maintain therefore that the entire Department cannot be a federally funded program or activity. They further note that Foss was not employed in either the FACT or EPDS programs, did not die and was not a lieutenant eligible to go to the National Fire Academy. Therefore, they maintain that even if his allegations are true, his termination implicated no federally funded program.

Case law on the subject of what constitutes a federally assisted program or activity for purposes of these statutes does not establish bright line rules on how such characterizations are made. The Supreme Court in *Darrone* indicated that the characterization need not be excessively narrow. In that case a Conrail locomotive engineer alleged that he had not been rehired following an accident because the accident left him handicapped. Conrail maintained that under the statute, employment discrimination was actionable only when the primary objective of the federal financial assistance was to provide employment. The Supreme Court rejected that argument. 465 U.S. at

633, 104 S.Ct. at 1254. On the other hand, the characterization should not be excessively broad. In *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), the court held that federal financial aid to students made their college a recipient of federal funds under Title IX. However, that did not make the whole college a federally funded program or activity; only its financial aid program was. *Id.* at 571–572, 104 S.Ct. at 1221. Characterization will ultimately depend to some extent on the facts of the particular case. *Darrone,* 465 U.S. at 636, 104 S.Ct. at 1255–56.

However, as the Supreme Court made clear in *Paralyzed Veterans,* what constitutes a federally funded program depends even more on the intent of Congress when it passed the statute granting the federal funds on which the claim is based. Both the term "recipient" and the "program or activity" are defined first of all by the grant statute. 477 U.S. at ——  – ——, —— – ——, 106 S.Ct. at 2710–11, 2713–14. In determining the scope of the "program or activity," one asks first whether Congress or an agency has "earmarked" the federal funds, *i.e.,* designated them for a particular purpose or a specific use. *Darrone,* 465 U.S. at 636, 104 S.Ct. at 1255–56; *Grove City,* 465 U.S. at 573, 104 S.Ct. at 1221–22. If Congress or the granting agency intended the funds for a particular purpose, then the relevant program or activity will in most cases be the one delineated by Congress in the statute and its legislative history, or by the agency in its terms for the grant. *See Grove City,* 465 U.S. at 566, 571–574, 104 S.Ct. at 1218, 1220–22; *O'Connor v. Peru State College,* 781 F.2d 632, 642 (8th Cir.1986). If the funds are not "earmarked," but rather their use is left to the recipient's discretion, then it makes sense to define the program or activity not only by the nature of the federal grant, but also in part by what the recipient did with the federal money. *See Arline v. School Board of Nassau County,* 772 F.2d 759, 762–763 (11th Cir.1985), *cert. granted,* 475 U.S. ——, 106 S.Ct. 1633, 90 L.Ed.2d 179 (1986).

### A. When the Federal Funds are not "Earmarked"

Foss maintains that he has claims both under the nondiscrimination provision of the revenue-sharing statute itself and, since revenue-sharing funds are federal funds, under the Rehabilitation Act. He contends that the Chicago Fire Department is appropriately considered a federally funded program or activity, even though none of these dollars actually reached the Department, because the City could have used the funds there (and could shift them there in the future), and because the federal dollars in the City's corporate fund freed up other monies for the Department. This is the most troubling claim, because if a municipality's program designation for receipt of federal funding, through budget procedures the municipality entirely controls, insulates all other programs from non-discrimination requirements, then a risk is created that the budget process will be viewed as a shell game to so insulate programs. Indeed, plaintiff raises the suspicion that an earlier shift of revenue-sharing funds from the Police Department was for that purpose. *And see Henning v. Village of Mayfield Village,* 610 F.Supp. 17 (N.D. Ohio 1985). Nevertheless, both an examination of the relevant statutes and of the use of the money leads us to the conclusion that revenue-sharing funds cannot provide Foss with a claim.

Under the Revenue Sharing Act the claimant is expected to show some kind of nexus between the discriminatory acts and the federal funds. 31 U.S.C. § 6716. Congress intended to limit claims under the statute to situations where there was direct contact between the funds and the program or activity in which the discrimination allegedly occurred. The House version of the provision would have found a violation when the challenged program or activity was federally funded "directly or indirectly." The Senate bill lacked those words and the Conference substitute, which eventually passed, did not include them. The Conference Committee report expressly

stated that the intent of the deletion was that there should be no violation unless the program or activity was directly funded with revenue sharing funds. House Conference Report No. 94–1720, 94th Cong., 2d Sess., at 2, *reprinted in* 1976 U.S. Code Cong. & Ad. News 5188, 5200. *Dowdell v. City of Apopka,* 511 F.Supp. 1375 (M.D. Fla.1981), *aff'd* 698 F.2d 1181 (11th Cir. 1983), is a classic example of what Congress meant to prohibit. A Southern town had used its revenue sharing funds for street paving, storm sewers and water pipes, and put virtually all of the new public works only in the white part of town. The public works were the program or activity and use of funds in that program in a discriminatory manner violated the Act. 511 F.Supp. at 1384.

Revenue sharing funds may also provide the basis for a claim when the source of funding for a particular governmental activity is uncertain. Congress anticipated the difficulties a plaintiff might have in tracing the precise federal dollars through a local government's books in order to show that the program or activity was federally funded. It therefore established a shifting burden of proof for claims under the statute. 31 U.S.C. § 6716(c)(1). The plaintiff's job is merely to show that a governmental unit receives revenue sharing funds. If so, the court should presume that all its programs and activities are federally funded. The governmental unit, however, may rebut that presumption with clear and convincing evidence that no federal dollars reached the program or activity in question. *See Harris v. White,* 479 F.Supp. 996, 1010–1011 (D.Mass.1979). But that provision will not save plaintiff's action here. Foss has shown that the City of Chicago receives revenue sharing funds. However, none of them reached the Fire Department, and the parties have so stipulated. The stipulation rebuts the presumption. With no direct federal funding, the department is not a federal program. Foss has no claim under the revenue sharing statute and his count II must be dismissed.

Foss argues that we should nevertheless reach a different result under the Rehabilitation Act because that statute's legislative history lacks a similar emphasis on the directness of the funding. We disagree. First of all, a program or activity for purposes of § 504 is determined "by reference to the grant statute." *Paralyzed Veterans,* 477 U.S. at ——, 106 S.Ct. at 2714. Thus, the revenue sharing statute's concept of "program" strongly tends to control the characterization of a "program" under § 504 when revenue sharing funds are the basis of the § 504 claim. Secondly, the Supreme Court, in its only statement on what constitutes a federally funded program or activity, has indicated that when the recipient controls the use of the federal funds, that use largely defines the program. *North Haven Board of Education v. Bell,* 456 U.S. 512, 540, 102 S.Ct. 1912, 1927, 72 L.Ed.2d 299 (1982). In *Bell,* the plaintiffs alleged discrimination in employment. The court held that such discrimination could be a violation of the statute, but remanded for a determination of whether the alleged acts related to a federally funded program. It suggested that they would not if the employer could show "that the complaining employees' salaries were not funded by federal money, that the employees did not work in an education program that received federal assistance, or that the discrimination they allegedly suffered did not affect a federally funded program." *Bell,* 456 U.S. at 540, 102 S.Ct. at 1927. Thus in *Greater Los Angeles Council of Deafness, Inc. v. Zolin,* 607 F.Supp. 175, 181 (C.D.Cal.1984), when the plaintiffs alleged discrimination against the deaf for jury service, the court dismissed for lack of jurisdiction. Neither the jury system nor the county courts were federally funded programs under § 504 because there was no showing that revenue sharing funds were actually used for the courts or were likely to be in the future.

Foss urges, on the strength of *Arline,* 772 F.2d at 763, and *Henning,* 610 F.Supp. 17, which appear to characterize "program" more broadly, that in a § 504 claim, when discretionary funds are involved, every program or activity of the unit re-

ceiving the funds is implicated. But *Arline*, at least, does not stand for that proposition. Rather, the court merely implied, as a matter of statutory construction and fairness, approximately the same shifting burden of proof to § 504 actions which Congress explicitly made part of the revenue sharing statute. When nonearmarked monies are involved, a plaintiff has the burden of showing that the governmental unit receives the funds. That makes any of the unit's programs or activities federally funded unless the unit can show that the program or programs in question did not in fact receive any funds. *Arline*, 772 F.2d at 763; cf. *Harris*, 479 F.Supp. at 1010. In *Arline*, the plaintiff had shown that nonearmarked federal impact aid had reached the School Board's general revenue fund. The School Board had commingled the funds and could not show that they were not used to pay teachers' salaries. The court therefore had jurisdiction over a teacher's claim of discrimination against her in her employment because of a handicap. *Arline*, 772 F.2d at 763. In the instant case, however, the City does not commingle funds.

Further, *Henning* is somewhat distinguishable from the case before us, though it gives the plaintiff some comfort. In *Henning*, an action by a handicapped police dispatcher, revenue sharing funds had been used for the police department in the previous year and were quite likely to be used for it again. 610 F.Supp. at 19. Chicago, however, has not used revenue sharing funds for the Fire Department since at least 1983, and gives no indication of using them there in the foreseeable future. Revenue sharing funds cannot be used as a basis for plaintiff's claim.

### B. When the Federal Funds are "Earmarked"

We turn to the other federal funds at issue, which are funds designated for particular uses. Plaintiff argues that the grant for the FACT team and the Emergency Management Funds make the Chicago Fire Department a federally funded program. We think, however, that *Grove City* stands for the contrary result. When dealing with earmarked funds, legislative or agency designations for the funds define the scope of the program. 465 U.S. at 573, 104 S.Ct. at 1221–22; see also *O'Connor*, 781 F.2d at 641. For example, the plaintiff in *O'Connor* alleged sex discrimination when she was fired as the women's basketball coach from a state college. The college received federal funds under Title III of the Higher Education Act of 1965 for faculty and student research. The court, examining the statement of purposes of the relevant portion of the Higher Education Act, concluded that the program or activity thus supported could at its broadest be defined as the academic program of the college. Since the alleged discrimination related only to the college's athletic program, there had been no discrimination in a federally funded program. 781 F.2d at 642.

Applying those principles to the case at bar, neither the FACT grant nor the Emergency Management funding provides a basis for a § 504 claim by Foss. The FACT team program appears self-defining as a program for training the unemployed and dealing with medical emergencies in a particular geographic area. The Emergency Management Funds support a program for dealing with disasters and emergencies. Any employment discrimination against Foss would not relate to either of these programs since Foss' employment had no connection with either program. Therefore, neither program gives Foss a vehicle for a § 504 action.

### III. "Recipient" Means: of Funds Under the Program Affected

Finally, Foss urges that the Department's refusal to rehire him falls literally under the scope of § 504 because that decision denied him the benefits of two federally funded programs: protection for his family under the Federal Death Benefits Program, and the possibility of attending the Fire Academy. The department's defense, that Foss had neither died nor risen

to the rank necessary for Academy eligibility, is not persuasive. There is also no question that both the Death Benefits Program and the Fire Academy are federally funded programs.

Nevertheless Foss cannot base his claim on these programs. The problem here is that the Department is not a recipient of federal funds under either program. The Supreme Court in *Paralyzed Veterans* emphasized that only recipients, not mere beneficiaries, are subject to coverage under the antidiscrimination provision of § 504. 477 U.S. at ——-——, 106 S.Ct. at 2711–13. In that case, the question was whether commercial airlines could be deemed recipients of the federal aid given to airports; and thus be subject to regulation on their treatment of handicapped passengers. The court held that they could not. A recipient is that person or entity receiving the money or other item of value under the grant statute. *Id.*, 477 U.S. at ——, n. 11, 106 S.Ct. at 2712 n. 11. Put another way, in keeping with the contractual nature of the anti-discrimination provisions, a recipient is a person or entity who is free to either accept or reject the federal funds. *Id.*, 477 U.S. at ——, 106 S.Ct. at 2711–13. Airlines received some benefit from the programs, but they were not recipients of aid.

The result in *Paralyzed Veterans* controls the result here. The death benefit program, part of the Public Safety Officers Benefits Act of 1976, is directed to employees of the Department and their dependents, rather than to the Department as a whole. The legislative history makes clear that the purpose of the statute was to make dangerous careers such as policeman and firefighter more acceptable to the qualified and dedicated by providing some protection to their families if they died in the line of duty. Senate Report No. 94–816, 94th Cong., 2d Sess. at 3–4, *reprinted in* 1976 U.S.Code Cong. & Ad.News 2504, 2504–2505. The program then is a program of benefits for policemen and firemen. The Fire Academy, established under the Federal Fire Prevention and Control Act of 1974, was part of a statute directed toward reducing the rate of death, injury and property loss from fires. As the legislative history indicates, the Academy was intended first of all to benefit the public, by improving the skills and techniques of firefighters. Secondarily, it had the related goal of increasing the professionalization of firefighting. Senate Report No. 93–470, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 6191, 6192–6193. The Academy as contemplated, would, for example, have included a placement office for professional firefighters, a promotion opportunities program and correspondence course offerings. *Id.* at 6192–6193, 6199. No funds actually reach any Fire Department as a result of either program. No department is free to accept or reject either program. Both programs benefit fire departments, but Foss himself would have to be considered the recipient under the programs. The Chicago Fire Department at most is a mere beneficiary.

It is of course true that the Department's decisions about who to hire and fire control who will enjoy the benefits of programs, but that merely places the Department in a position analogous to that of the commercial airlines in *Paralyzed Veterans.* The dissent in that case, 477 U.S. at ——-——, 106 S.Ct. at 2717–18 (Marshall, J.), expressly argued that such "gatekeepers" who determined individual access to the benefits from the aid should be subject to § 504. The majority was not persuaded. The federal agency could demand wheelchair ramps at airports because the airports were a federally funded program or activity. It could not demand appropriate facilities for the handicapped in airplanes, so that there would be some point to handicapped persons using the ramps, because the airlines were not recipients of federal funds. If the Rehabilitation Act does not reach airlines in those circumstances, we do not think it can reach the Fire Department here.

Nor do we think that the fact that the Department is a recipient of federal funds under other, unrelated programs makes *Paralyzed Veterans* distinguishable. Admittedly, discriminatory acts need not nec-

essarily occur in the federally funded program itself to be actionable under the statute. Discrimination in a related activity could be so pervasive that it infects or thwarts the purpose of the federal program. A program or activity at an educational institution, for example, can be tainted by blatant, systematic discrimination elsewhere in that institution. *See Bell*, 456 U.S. at 540, 102 S.Ct. at 1927–28; *Southeastern Community College v. Davis*, 442 U.S. 397, 400, 99 S.Ct. 2361, 2364, 60 L.Ed.2d 980 (1979) (allegation of discrimination against handicapped in admissions to nursing degree program); *Iron Arrow*, 702 F.2d at 556, 564 (gender discrimination in university's principal academic honor society); *Finch*, 414 F.2d at 1078. But in those cases, the institution was at least a recipient of funds under the program alleged to be affected. The statute requires some relationship between the discriminatory act and federal financial assistance. Here, there is no discernible contact between the discrimination Foss allegedly suffered and any federal funds the Department receives.

The Fire Department will not, of course, be able to avoid most claims of employment discrimination so easily. Discrimination in employment on the basis of race, religion, national origin or sex is actionable under Title VII of the Civil Rights Act, and on the basis of age under the Age Discrimination in Employment Act, without regard to the presence or absence of federal financial assistance. But handicapped persons must show that employment discrimination relates to a federally funded program. Congress saw fit to give the City of Chicago the opportunity to structure its conduct in such a way as to avoid being subject to the anti-discrimination provisions of the Rehabilitation Act and the Revenue Sharing Act. *Cf. Paralyzed Veterans*, 477 U.S. at —, 106 S.Ct. at 2711–13. The Fire Department has taken advantage of that opportunity. Thus, even if everything Foss alleges is true, this court has no jurisdiction over his claim.

**CONCLUSION**

Defendants' motion to dismiss is granted as to all counts of plaintiff's complaint.