Tina BENNETT, Geneva McAfee, Deanne Robertson, Yvonne Berryhill, Arlene Bern and Diana Byrnes, Plaintiffs-Appellants,

v.

WEST TEXAS STATE UNIVERSITY, et al., Defendants-Appellees.

No. 85–1429.

United States Court of Appeals, Fifth Circuit.

Sept. 5, 1986.

Suzanne E. Meeker, Washington, D.C., Hoffman & Wheeler, Betty Wheeler, Amarillo, Tex., Nancy Duff Campbell, Marcia D. Greenberger, Washington, D.C., for plaintiffs-appellants.

Sedora R. Jefferson, Carla M. Crisford, Asst. Attys. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for defendants-appellees.

Before GEE, RANDALL, and DAVIS, Circuit Judges.

RANDALL, Circuit Judge:

Appellants, a class of female student athletes at West Texas State University, appeal from summary judgment. The class alleges sex discrimination in violation of Title IX of the Education Amendments of 1972 in the University's intercollegiate athletics program. The district court held, however, that Title IX coverage does not extend to the athletics program as it is not receiving federal financial assistance within the meaning of § 901 of Title IX. We affirm.

I.

Appellants filed this class action against West Texas State University ("WTSU" or "the University") and several of its officials on April 15, 1980, alleging that WTSU discriminates on the basis of gender in its intercollegiate athletics program. Appellees' first motion for summary judgment was granted on July 27, 1981. The court held that Title IX applies only to a program or activity that receives "direct" federal financial assistance, and characterized the federal funding received by the WTSU athletics program as "indirect." 525 F.Supp. 77, 80 (N.D.Tex.1981). Appellants appealed from that judgment. On appeal, this court in an unpublished opinion declined to decide whether the federal funding re-

ceived by the University brought it under the ambit of Title IX, but remanded to give appellants the opportunity to develop the record on the receipt of federal financial assistance by the athletics department. 698 F.2d 1215 (5th Cir.1983), *cert. denied*, 466 U.S. 903, 104 S.Ct. 1677, 80 L.Ed.2d 152 (1984).

On remand, the district court again granted the defendants' motion for summary judgment after considering evidence regarding the financial assistance received by the athletics program. The court held that the intervening decision in *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), controlled, and that the athletics program was not federally assisted within the meaning of that decision.

Appellants appeal on three grounds: (1) that the receipt of federal funds by WTSU directly benefits the intercollegiate athletics program within the meaning of § 901 of Title IX, (2) that even if the federal funding is not deemed "direct", the program is covered under Title IX because sex discrimination in that program "infects" other federally assisted programs at the University, and (3) that under *Grove City*, at least the athletic scholarship component of the intercollegiate athletics program is covered because the financial aid office assists in administering those scholarships, and it is clearly in receipt of federal funds.

## II.

Appellants point to several sources of federal funding which they claim directly benefit the intercollegiate athletics program and thereby bring it under Title IX coverage. Federal student financial aid, including Basic Educational Opportunity Grants ("BEOGS" or "Pell Grants"), is the main source of such funding, contributing nearly one million dollars a year to WTSU student recipients. Appellants argue that a number of the recipients of the federal aid are student athletes, and that the mandatory student service fee, which comprises

a large portion of the athletic department's budget, is paid in part by these funds. Thus, appellants urge, Title IX coverage over the athletics program is activated. Appellants also point out that federal work study money, federal subsidies for physical facilities, and unrestricted revenue sharing funds all directly benefit the athletics department to the degree required by Title IX to trigger coverage.

*Grove City* supports appellants' argument that federal funds received by a college via Pell Grants or other student aid is sufficiently "direct" to trigger Title IX coverage. *Grove City* holds that the distinction between "direct" and "indirect" receipt of funds in this context is a false one. "[T]he language of § 901(a) contains no hint that Congress perceived a substantive difference between direct institutional assistance and aid received by the school through its students," 465 U.S. at 564, 104 S.Ct. at 1217. Additionally, the Court explained in *Grove City*, Congress intended that students' receipt of federal financial aid would prompt Title IX coverage. The Court determined such intent largely by analogy to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (1982), after which Title IX was patterned. *See Cannon v. University of Chicago*, 441 U.S. 677, 685, 99 S.Ct. 1946, 1951, 60 L.Ed.2d 560 (1979). The intent to trigger Title VI coverage by receipt of student aid was indicated in the congressional record,[1] and the Court could "discern no reason to believe that the Congressmen who voted for Title IX intended a different result." 465 U.S. at 566, 104 S.Ct. at 1218.

 It is clear, then, that Title IX coverage is mandated at WTSU by virtue of the receipt of federal student financial aid. However, as in *Grove City*, here too the program covered will be the financial aid program. The intercollegiate athletics department at WTSU receives no earmarked federal funds, Record, Vol. IV at 36, and evidence at trial indicated that the benefit

---

1. *See, e.g.* H.R.Rep. No. 914, 88th Cong., 1st Sess., 104–105 (1963); 110 Cong.Rec. 13388 (1964) (Sen. McClellan).

derived by the athletics department from federal funds received by the University was merely incidental, e.g. Record, Vol. IV at 35–37, 40, 48, 51. This type of "trickle-down" benefit is just the type that *Grove City* explicitly ruled did not trigger Title IX coverage:

> [The] assumption that Title IX applies to programs receiving a larger share of a school's own limited resources as a result of federal assistance earmarked for use elsewhere within the institution is inconsistent with the program-specific nature of the statute. Most federal educational assistance has economic ripple effects throughout the aided institution, and it would be difficult, if not impossible, to determine which programs or activities derive such indirect benefits.

465 U.S. at 572, 104 S.Ct. at 1221.

*United States Department of Transportation v. Paralyzed Veterans of America,* — U.S. —, —, 106 S.Ct. 2705, 2712, 91 L.Ed.2d 494 (1986), reaffirms the program-specific emphasis of *Grove City,* and also clarifies the issue of "indirect" aid:

> While Grove City stands for the proposition that Title IX coverage extends to Congress' intended recipient, whether receiving the aid directly or indirectly, it does not stand for the proposition that federal coverage follows the aid past the recipient to those who merely benefit from the aid.

Appellants' argument here is analogous to those refuted by *Grove City* and *Paralyzed Veterans.* The federal funding received by the athletics department is channeled first through the University's general budget. The mandatory student service fees may be paid in part by federal funds, but to find Title IX coverage of every program which benefited from such fees would be to find coverage over the entire University. The same broad benefit is true of work study money, and federal building subsidies. While "indirect" aid received via a student recipient does trigger Title IX

coverage, it does not trigger coverage over all *programs* which "indirectly" benefit from that aid. So, for the same reasons the arguments in *Grove City* and *Paralyzed Veterans* failed, the argument here must also fail.

### III.

■ Appellants' second argument, the "infection" theory, is flawed as well. Appellants urge that the discrimination practiced by the WTSU athletics department can be imputed to other departments which do receive federal funds. The Fifth Circuit first mentioned this theory in *Board of Public Instruction of Taylor County, Florida v. Finch,* 414 F.2d 1068 (5th Cir. 1969), as a means by which to obtain Title IX coverage over a program not in direct receipt of federal funds. *Finch* holds that Title VI requires a programmatic approach, but warns that a program should not "be considered in isolation from its context.... [A program may be] so affected by discriminatory practices elsewhere in the school system that it thereby becomes discriminatory." 414 F.2d at 1079.[2] The only case, however, to have applied the theory to find such pervasive discrimination is *Iron Arrow Honor Society v. Heckler,* 702 F.2d 549 (5th Cir.1983), *vacated as moot,* 464 U.S. 67, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983). *Iron Arrow* was the most prestigious honor society on the University of Miami campus, and it admitted only men. The Fifth Circuit held that the organization's visibility on campus among both students and faculty created an environment that was so discriminatory as to infect all programs there, including those in receipt of federal funds. The *Iron Arrow* court, however, anticipated appellants' argument here, and discredited it, saying that attempted application of Title IX by means of the "infection theory" to athletics programs will fail, as such programs are "discrete programs which do not

---

**2.** *North Haven Board of Education v. Bell,* 456 U.S. 512, 539–40, 102 S.Ct. 1912, 1927, 72 L.Ed.2d 299 (1982), also mentions this theory as a viable means of bringing a given program under coverage by Title IX.

affect the entire academic structure of the University." 702 F.2d at 564.[3]

## IV.

Appellants' third argument is that the WTSU student financial aid office, which is clearly a recipient of federal funds under Title IX and *Grove City*, has at least partial responsibility for the administration of athletic scholarships. Therefore, appellants urge that athletic scholarships themselves must be administered in a nondiscriminatory manner. *Grove City* supports this argument, noting that all students who are participants in the college's financial aid program, even those who do not themselves receive federal assistance, are protected by Title IX. 465 U.S. at 571 n. 21, 104 S.Ct. at 1221 n. 21.

The question here becomes, then, whether or not athletic scholarships are *part* of WTSU's financial aid program. The financial aid office is responsible for overseeing the award of athletic scholarships only to be certain that the total amount of funding awarded to any given student does not exceed the maximum allowed by federal or NCAA regulations. To the extent that the total of any student's Pell Grant funds plus athletic scholarship award exceeds the maximum allowed, the athletic scholarship award will be reduced, thereby freeing up additional funding for the athletics program. Record Vol. IV at 79–80, 84. This is the full extent of the relationship between athletic scholarships and the financial aid program. Appellants' counsel conceded at oral argument that an athletic scholarship award is determined solely by the athletic department; the financial aid office plays no role in determining the recipient of the award.

Thus, the factual issue of whether athletic scholarships are part of the financial aid program is resolved in the record. There is merely a ministerial relationship between the two programs, insufficient to bring athletic scholarships under Title IX coverage.

The extent to which federal funds supplement athletic scholarship funds is not relevant under *Grove City*. There remains no issue of material fact to mandate reversal of the summary judgment.

Accordingly, the judgment of the District Court is

AFFIRMED.

---

3. Further, the decision by the Supreme Court to vacate *Iron Arrow* eliminates any precedential value it might have. *United States v. Munsing-* *wear, Inc.,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950).