**1532**

UNITED STATES of America,
Plaintiff-Appellee,

John F. Knight, Jr., et al., individually and on behalf of others similarly situated, Plaintiffs-Intervenors-Appellees,

v.

The STATE OF ALABAMA; George C. Wallace, Governor of the State of Alabama; and the Alabama Public School and College Authority; the Alabama State Board of Education; Wayne Teague, State Superintendent of Education; Auburn University, a public corporation; the Board of Trustees for the University of Alabama, a public corporation; Troy State University, a public corporation, Defendants-Appellants,

Board of Trustees for Alabama State University, a public corporation; the Board of Trustees for Alabama A & M University, a public corporation, Defendants.

No. 86–7090.

United States Court of Appeals,
Eleventh Circuit.

Oct. 6, 1987.

Jeffrey A. Foshee, Dept. of Postsecond·ary Educ., Montgomery, Ala., for Alabama State Bd. of Educ. & Wayne Teague.

Ira DeMent, DeMent & Wise, Ronald W. Wise, Montgomery, Ala., for George C. Wallace, Gov. and The Alabama Public School and College Authority.

Richard F. Calhoun, Brantley & Calhoun, Troy, Ala., J. Frederic Ingram, Burr & Forman, William F. Murray, Jr., Birmingham, Ala., for Troy State University.

T.W. Thagard, Jr., Balch & Bingham, Montgomery, Ala., Edward S. Allen, Balch & Bingham, Birmingham, Ala., for Auburn University.

Robert L. Potts, Office of Gen. Counsel for University of Alabama System, C. Glenn Powell, Stanley Jay Murphy, Tuscaloosa, Ala., John O. Cates, The University of Ala. in Huntsville, Robert W. Rieder, Huntsville, Ala., for Bd. of Trustees—University of Alabama.

Frank W. Donaldson, U.S. Atty., Caryl P. Privett, Birmingham, Ala., Mark Gross, U.S. Dept. of Justice, William Brad Reynolds, Jessica D. Silver, Miriam Gisenstein, Michael A. Carvin, Washington, D.C., for U.S.

Solomon S. Seay, Jr., Law Offices of Solomon S. Seay, Jr., & Terry G. Davis, Montgomery, Ala., Armand Derfner, McClain & Derfner, Charleston, S.C., for Bd. of Trustees—Alabama State University.

J.U. Blacksher, Mobile, Ala., for intervenors John F. McKnight, Jr., et al.

Joe R. Whatley, Falkenberry, Whatley & Heidt, Birmingham, Ala., Donald V. Watkins, Watkins, Carter & Knight, Montgomery, Ala., for Bd. of Trustees—Alabama A & M University.

Before VANCE and KRAVITCH, Circuit Judges, and BROWN,* Senior Circuit Judge.

PER CURIAM:

## I. INTRODUCTION

This case presents claims of racial discrimination in the State of Alabama's system of public higher education. Complaints filed by the United States and a class representing students, graduates, faculty and staff at Alabama State University allege that defendants have failed to take affirmative steps to remove the vestiges of the dual system of higher education that resulted from the State's past policy of racial segregation. The nature of the claims—calling for an analysis of the racial character of public higher education in Alabama since the first public college was organized in 1831—raises a number of difficult and novel questions. Similarly, the nature of the relief sought—including a demand for increased funding and the transfer of programs to the historically black public universities—poses serious problems. By its very nature, this case cries out for a solution reached among the parties themselves. The United States, State of Alabama, Governor of Alabama, Alabama State Board of Education, the governing boards of the ten public universities, and the concerned members of these educational communities are surely in the best position to resolve the important issues this case presents for the future of higher education in Alabama. Their failure of leadership, however, leaves by default the responsibility with the courts. Faced with claims that the defendant institutions have engaged in racially discriminatory practices, the judicial system must examine plaintiffs' claims and, if meritorious, vindicate the constitutional and statutory rights of black Alabamians.

## II. BACKGROUND

### A. The Complaint of the United States

In January 1981, the United States Department of Education notified the Governor of Alabama of its finding that there remained vestiges of a prior, racially dual system of higher education in Alabama in violation of title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d. Title VI prohibits discrimination on the basis of race in federally assisted programs. After unsuccessful negotiations over a statewide remedial plan, the Department of Education referred the matter to the Department of Justice pursuant to 42 U.S.C. § 2000d–1.

The United States filed this action on July 11, 1983. The complaint named as defendants the State of Alabama, its Governor, the Superintendent of Education, the State Board of Education, the Alabama Commission on Higher Education, the Alabama Public School and College Authority, and ten public colleges and universities. The complaint charges violations of title VI and the fourteenth amendment of the United States Constitution. According to the United States, prior to 1953 the defendants had "established and maintained a racially dual system of public higher education." The complaint alleged that the enrollment of students and hiring of faculty at all schools in Alabama had been segregated by state law or by policy and practice. The complaint also contended that the two historically black schools, Alabama State University ("ASU") and Alabama A & M University ("A & M"), were continually given less financial support than the white institutions.

The United States alleged that the defendants have perpetuated that racially

---

* Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designa- tion.

dual system. The complaint charged that since 1953, the defendants have continued to pursue policies and practices that have resulted in a public higher education system in which the institutions' student bodies, faculties, and governing boards are still substantially segregated by race. The United States requested that defendants be required to develop and implement plans eliminating the vestiges of this racially dual system of public higher education.

### B. The Complaint of the Knight Intervenors

In January 1981, John F. Knight, Jr., and others described as students, graduates, faculty and employees of Alabama State University ("Knight intervenors"), filed an action under 42 U.S.C. §§ 1981 and 1983 in the United States District Court for the Middle District of Alabama. They claimed that the continued existence of vestiges of past racial segregation in public higher education in the Montgomery area violated title VI and the fourteenth amendment. These plaintiffs complained of the duplication of the programs at ASU, an historically black institution, by two predominantly white institutions, Auburn University at Montgomery and Troy State University at Montgomery. They argued that the State had failed to carry out its duty to dismantle the dual system of higher education in Montgomery. Their complaint sought merger of these two white institutions into ASU.

On September 15, 1983, the named plaintiffs in *Knight v. Wallace* moved to intervene in the present action on the ground that its outcome would be determinative of the issues in their case. The district court granted the motion to intervene and certified them as representatives for a class including graduates of ASU; black adults or minor children in Alabama presently attending, or eligible to attend now or in the future, any public institution of higher education in the Montgomery area; and black citizens who were, are or will become eligible to be employed by such institutions.[1]

### C. The District Court's Ruling

After extensive discovery and numerous pre-trial motions,[2] a month-long trial took place before Judge U.W. Clemon in July 1985.[3] On December 9, 1985, the district court issued its memorandum opinion, 628 F.Supp. 1137, which held that the state had never fully eliminated the vestiges of its prior, racially dual system of higher education. The lengthy opinion began by discussing the historical development of the dual system of higher education. The court examined the history of each public college in Alabama up to 1965 and found that the colleges were segregated by law and by custom. The court found that during this period black schools were given far less state funding than white colleges. The court also described how "[t]he Board of Education and State of Alabama took various actions which had the effect of stymieing the growth and development of both Alabama A & M and Alabama State College [ASU]."

The opinion then reviewed the status of each institution of higher education in Alabama in the period between 1965 and 1975 and listed a series of actions undertaken by defendants which continued the racially dual system  The court found that the expansion of the University of Alabama at Huntsville into a full degree-granting institution and the course duplication of Athens State—Calhoun Community College inter-

---

1. The district court also realigned A & M and ASU as plaintiffs and permitted these institutions to assert claims under title VI and the fourteenth amendment. In a previous appeal growing out of this lawsuit, this court held that ASU and A & M were instrumentalities of the State and, as such, lacked standing to assert these claims. *United States v. Alabama,* 791 F.2d 1450 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987). Consequently, the realignment of A & M and ASU as plaintiffs was improper.

2. One such motion was defendants' attempt to have Judge Clemon disqualified from the case. For a discussion of the lower court's handling of this motion, *see infra* part III, B, 1.

3. Prior to and during the trial, the United States entered into consent decrees with Livingston University, Jacksonville State University, the University of Montevallo, and the University of South Alabama.

fered with A & M's ability to recruit white students and faculty. The court also noted that the development of the Montgomery campuses of Auburn University and Troy State University served to duplicate ASU's programs and thus had a negative impact on white enrollment at ASU. In addition, the opinion found that the State's allocation of funds and programs further reinforced ASU and A & M's historical status as second class black institutions.

The court then made detailed findings as to the vestiges of the prior, racially dual system that presently exist in Alabama's institutions of higher education. The opinion examined the student enrollment, faculty employment, and governing boards at each institution. The court found that the student bodies at Auburn, Auburn University at Montgomery, University of Alabama at Huntsville and Athens State College, in addition to those at ASU and A & M, remained identifiable by race. The court also found that the faculties and governing boards of all the institutions were racially identifiable. The district court made a thorough examination of the various policies and programs at each institution that contribute to perpetuating this racially dual system. The court also studied the distribution of funding and program offerings between the traditionally black and white institutions and found that they served to maintain vestiges of past discrimination. The district court rejected defendants challenge to the standing and "systems-wide" approach of plaintiffs and concluded "that the State has not dismantled the dual system of higher education."

The district court ordered the State, the Governor, the Alabama Commission on Higher Education, and the Alabama Public School and College Authority to submit a remedial plan consistent with its findings to "eliminate all vestiges of the dual system." Defendants filed notices of appeal and moved for a stay. On February 14, 1986, this court stayed all further district court proceedings pending disposition of this appeal.[4]

## III.  ISSUES

On appeal, defendants assert a broad array of error. These claims of error are of two types. Defendants raise a number of threshold issues, contesting whether the trial judge can properly sit on the case and the right of the plaintiffs to bring these claims. Secondly, defendants challenge the district court's decision on the merits, arguing that the factual findings are clearly erroneous and that the lower court applied incorrect legal standards. As a consequence of our rulings on the threshold issues, however, we do not reach the merits of the district court's decision.

### A.  Appealability

■ The first issue that this court must address is plaintiffs' contention that the district court's opinion is not an appealable final order.

Plaintiffs argue that the opinion below cannot be a "final order" under 28 U.S.C. § 1291 because the district court has required that a remedial plan still be submitted for adoption by the court. They maintain that no final order exists until the district court actually promulgates its remedial plan. Plaintiffs, however, subscribe to an overly literal view of what constitutes a final order. The Supreme Court has rejected such a formalistic approach to appealability, noting that " 'final' within the meaning of § 1291 does not necessarily mean the last order possible to be made in a case." [5] As Chief Justice Warren wrote for the Court in *Brown Shoe Co. v. United States:*

> The Court has adopted essentially practical tests for identifying those judgments which are, and those which are

---

4. Pursuant to the district court's order, several defendants filed their proposed remedial plans on February 14, 1986. This court, however, stayed all district court proceedings on that date.

5. *Gillespie v. United States Steel Corp.,* 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964) (citing *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 545, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949)); *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 722 n. 28, 94 S.Ct. 2006, 2022, n. 28, 40 L.Ed.2d 476 (1974).

not, to be considered "final." A pragmatic approach to the question of finality has been considered essential to the achievement of the "just, speedy, and inexpensive determination of every action"....[6]

The district court's 99–page opinion in this case is for all practical purposes a final order. In its specificity, detail, and comprehensiveness, the opinion resolves every issue before the court. The district judge leaves defendants with little flexibility in drafting a remedial order consistent "with the findings and the ... reasonable inferences ... flowing from the court's memorandum of opinion." The opinion clearly spells out the offending policies and practices which must be abolished. The district court gives detailed instructions in every area, from the finding that sixteen evening extension courses at Calhoun Community College "needlessly duplicat[e]" evening courses offered by A & M, to the finding that Auburn University's requirement of a minimum ACT score of 18 has an improper disparate impact on black enrollment, to the finding that the faculty at the University of Alabama and Auburn University were paid an average of 28% more than faculty at ASU and A & M. We thus conclude that the decree of the district court in this case possesses sufficient indicia of finality to support an appeal under 28 U.S.C. § 1291.[7]

Our decision follows the reasoning of this court's predecessor in *Morales v. Tur-*man.[8] Morales brought a class action attacking the constitutionality of the practices and policies of the Texas juvenile correction system. The district court held that the Texas system had failed to achieve the minimum standards demanded by the constitution. Appellees argued that this ruling was not appealable "because the judge withheld issuance of permanent injunctive relief pending submission of a comprehensive plan to be drawn up by the parties."[9] Although conceding that "some flexibility was left to the parties in determining precisely how compliance with the minimum standards would be structured," this court's predecessor determined that the district court's opinion satisfied the "practical" test for finality established by the Supreme Court. The *Morales* court noted that the detailed minimum standards set out by the district court were not "mere guidelines subject to further negotiation by the parties," but instead, "constitute[d] a final adjudication determining the minimal content that must be given to the 'right of treatment' as it applies to virtually every aspect of [the Texas system's] operations."[10] As such, the district court's opinion was a final decision properly appealable under 28 U.S.C. § 1291. Other appeals courts have interpreted § 1291 in a similar fashion and held lower court opinions to be appealable where the opinions are sufficiently detailed, even though a remedial plan had yet to be adopted.[11]

**6.** 370 U.S. 294, 306, 82 S.Ct. 1502, 1513, 8 L.Ed.2d 510 (1962) (footnotes omitted). *See also Bradley v. School Bd. of Richmond,* 416 U.S. at 722 n. 28, 94 S.Ct. at 2022 n. 28 ("This Court has been inclined to follow a 'pragmatic approach' to the question of finality.") (citing *Brown Shoe Co.,* 370 U.S. at 306, 82 S.Ct. at 1513); *Gillespie v. United States Steel Corp.,* 379 U.S. at 152, 85 S.Ct. at 311 ("[T]his Court has held that the requirement of finality is to be given a 'practical rather than a technical construction.'") (quoting *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. at 546, 69 S.Ct. at 1225); *Freeman v. Califano,* 574 F.2d 264, 267 (5th Cir.1978) ("This Court has long followed the flexible, practical approach to finality."). *See also* Redish, *The Pragmatic Approach to Appealability in the Federal Courts,* 75 Colum.L.Rev. 89 (1975).

**7.** *See Brown Shoe Co.,* 370 U.S. at 308, 82 S.Ct. at 1514; *cf. Mahaley v. Cuyahoga Metro. Hous.*

*Auth.,* 500 F.2d 1087 (6th Cir.1974), *cert. denied,* 419 U.S. 1108, 95 S.Ct. 781, 42 L.Ed.2d 805 (1975); *Thoms v. Heffernan,* 473 F.2d 478 (2d Cir.1973), *vacated on other grounds,* 418 U.S. 908, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974)

**8.** 535 F.2d 864 (5th Cir.1976), *rev'd on other grounds,* 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977).

**9.** 535 F.2d at 867 n. 6.

**10.** *Id.*

**11.** *See, e.g., Mahaley v. Cuyahoga Metro. Hous. Auth.,* 500 F.2d 1087, 1090 n. 3 (6th Cir.1974) (ruling requiring preparation of plan to provide non-discriminatory, low cost housing held to be appealable final order), *cert. denied,* 419 U.S. 1108, 95 S.Ct. 781, 42 L.Ed.2d 805 (1975); *Board of Educ. of Oklahoma City Pub. Schools v. Dow-*

Plaintiffs rely heavily on *Taylor v. Board of Education of New Rochelle*,[12] citing this case as definitively ruling that a district court opinion finding racial discrimination and ordering authorities to propose a remedial plan is not appealable. It is true that "[a] district court order requiring submission of a plan, without more, is not appealable."[13] The *Taylor* court followed this general rule in dismissing an appeal from an order directing the school board to submit a desegregation plan. Yet as Judge Friendly, the author of *Taylor*, noted in a later case, there exist "two situations in which the normally non-appealable order to submit a plan may be appealable: when the order contains other injunctive relief, or when the content of the plan to be submitted has already been substantially prescribed by the district court."[14] In *Taylor*, neither of these two exceptions applied since the lower court's determination "that a remedial plan must be submitted provided only a skeletal outline for later adjudication."[15] The facts of the instant case compel a different result, however. A review of the opinion below demonstrates that Judge Clemon has already "substantially prescribed" the remedial plan.[16] Therefore the issues before this court are fixed, and the present appeal is not premature.[17]

## B. The Disqualification Issue

### 1. Procedural Background

Appellants argue that the lower court erred in not disqualifying Judge Clemon from deciding this case. Before reaching the substance of this claim, however, we outline the complicated procedural history of this issue.

On September 6, 1983, Auburn University moved to disqualify Judge Clemon pursuant to 28 U.S.C. §§ 144 and 455. Three days later, the State Superintendent of Education Wayne Teague filed a similar motion. These motions were accompanied by affidavits, signed by the respective attorneys for these parties, setting forth various facts in support of the motions. Judge Clemon denied the recusal motions. The judge ruled that the affidavits did not meet the technical requirements of 28 U.S.C. § 144 since they were not executed by a party and that a reasonable person, viewing the true facts, would not harbor doubts

ell, 375 F.2d 158 (10th Cir.) (ruling requiring defendants to submit a school desegregation plan consistent with detailed report of an expert panel considered to be appealable), *cert. denied,* 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967). *Cf. Brown Shoe Co.,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (opinion finding a violation of antitrust statutes and ordering divestiture held appealable, despite leaving to further order how divestiture would be accomplished); *Frederick L. v. Thomas,* 557 F.2d 373 (3d Cir.1977) (opinion requiring defendants to submit plan to identify all learning disabled children was appealable under § 1292(a)); *Board of Pub. Instruction v. Braxton,* 326 F.2d 616 (5th Cir.) (opinion requiring defendants to submit school desegregation plan was injunction sufficiently detailed to be appealable under § 1292(a)), *cert. denied,* 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964).

**12.** 288 F.2d 600 (2d Cir.), *cert. denied,* 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961).

**13.** *Liddell v. Board of Educ. of St. Louis,* 693 F.2d 721, 723 (8th Cir.1981) (and cases cited therein).

**14.** *Spates v. Manson,* 619 F.2d 204, 209 (2d Cir. 1980).

**15.** *Id.* (quoting *Frederick L. v. Thomas,* 557 F.2d 373, 380–81 (3d Cir.1977)).

**16.** A strong argument could also be made that the lower court's opinion in this case is an injunction appealable pursuant to § 1292(a) because it compels the preparation of a plan dealing expressly with a detailed list of acts. *See Board of Pub. Instruction v. Braxton,* 326 F.2d 616 (5th Cir.), *cert. denied,* 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964); *Frederick L. v. Thomas,* 557 F.2d 373 (3d Cir.1977).

**17.** A pre-implementation order, however, may also be reviewable as "final." Although a pre-implementation order adjudging liability but leaving the quantum of relief for subsequent determination is normally non-final and non-appealable, this general rule does not always hold in institutional civil rights litigation. District court orders establishing violations frequently specify minimum legal standards that serve as a blueprint for remedy implementation. Where the standards are specific, most issues can be resolved by immediate review and the danger of piecemeal appellate review is minimal.
Note, *The Remedial Process in Institutional Reform Litigation,* 78 Colum.L.Rev. 784, 846 (1978) (footnotes omitted).

concerning his impartiality. Auburn then filed a petition for a writ of mandamus. A panel of this court held that a later affidavit executed by the President of Auburn University met the technical requirements of 28 U.S.C. § 144 and remanded with directions that another judge be assigned to hear the recusal motion.[18]

Senior District Judge Hobart Grooms was assigned the recusal proceedings, held a hearing and received evidence in the matter. On December 19, 1983, Judge Grooms issued an order granting the motions to disqualify Judge Clemon. Judge Grooms concluded that Judge Clemon's involvement as a counsel of record in *Lee v. Macon County Board of Education* gave him "personal knowledge of disputed evidentiary fact." Judge Grooms also concluded that Judge Clemon's personal and political relationship with former Senator Stewart, then attorney of record for defendant Alabama A & M, raised the appearance of bias. On January 19, 1984, however, Judge Grooms vacated his order and recused himself.[19] Senior Circuit Judge David Dyer then heard defendants' disqualification motions and denied the motions. Judge Dyer found no evidence that Judge Clemon's association with former Senator Stewart would affect the judge's impartiality and concluded that the affidavits did not connect Judge Clemon's involvement in *Lee v. Macon* to any aspect of the present case. Judge Dyer also denied Auburn's request to certify the issue for interlocutory appeal under 28 U.S.C. § 1292(b). As a result, Judge Clemon presided over and decided this non-jury case.

### 2. Legal Standard

"The guarantee to the defendant of a totally fair and impartial tribunal, and the protection of the integrity and dignity of the judicial process from any hint or appearance of bias is the palladium of our judicial system."[20] To ensure that the courts remain above reproach, the Congress passed statutory provisions governing the disqualification of federal judges. The relevant statutes are 28 U.S.C. §§ 144 and 455.[21] These two statutes control ap-

---

**18.** *In re: Auburn University,* No. 83–7557 (11th Cir. Nov. 10, 1983).

**19.** Appellants imply that Judge Grooms was pressured to recuse himself by harsh public criticism attributed to Judge Clemon by the media. They argue that these statements are clear evidence of the trial judge's personal bias against them. We do not find it necessary to reach this issue.

**20.** *United States v. Columbia Broadcasting Sys.,* 497 F.2d 107, 109 (5th Cir.1974).

**21.** 28 U.S.C. § 144 provides:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

28 U.S.C. § 455 provides, in pertinent part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

pellants' claim that the lower court erred in failing to disqualify Judge Clemon from presiding over this case.[22]

■ Disqualification under § 144 requires that a party file an affidavit demonstrating the judge's personal bias or prejudice against that party or in favor of an adverse party. The statute mandates that the affidavit be filed within a specified time period and that it be accompanied by a certificate of good faith by a counsel of record. If an affidavit is timely and technically correct, the trial judge may not pass upon the truthfulness of the facts stated in the affidavit even when the court knows these allegations to be false. The statute restricts the trial judge to determining whether the facts alleged are legally sufficient to require recusal.[23] The test for legal sufficiency adopted by this Court requires a party to show:

1. The facts are material and stated with particularity;

2. The facts are such that, if true they would convince a reasonable person that a bias exists.

> (i) Is a party to the proceeding, or an officer, director, or trustee of a party;
> (ii) Is acting as a lawyer in the proceeding;
> (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;
> (iv) Is to the judge's knowledge likely to be a material witness in the proceeding.
>
> . . . . .
>
> (e) No justice, judge, or magistrate shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

22. The right to a fair trial before an impartial judge is a basic requirement of due process and thus guaranteed by the United States Constitution. However, because the statutory grounds for disqualification are stricter than the requirements of due process, it is not necessary to address the constitutional dimensions of disqualification. *See* Hjelmfelt, *Statutory Disqualification of Federal Judges*, 30 U.Kan.L.Rev. 255, 255 (1982) (hereinafter *Statutory Disqualification* ).

23. *United States v. Serrano,* 607 F.2d 1145, 1150 (5th Cir.1979), *cert. denied,* 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980); *Davis v.*

3. The facts show that the bias is personal, as opposed to judicial, in nature.[24]

■ In 1974, Congress rewrote 28 U.S.C. § 455 to correct perceived problems in the disqualification statutes. Prior to 1974, both the technical and legal sufficiency requirements of § 144 had been construed strictly in favor of judges.[25] Courts also operated under the so-called "duty to sit" doctrine which required a judge to hear a case unless a clear demonstration of extrajudicial bias or prejudice was made.[26] Consequently, disqualification of a judge was difficult under § 144. In passing the amended 28 U.S.C. § 455, Congress broadened the grounds and loosened the procedure for disqualification in the federal courts. Although a party still is permitted to make a motion and submit affidavits to bring about a judge's disqualification, the statute places a judge under a self-enforcing obligation to recuse himself where the proper legal grounds exist.[27] The statute also did away with the "duty to sit"[28] so the benefit of the doubt is now to be resolved in favor of recusal. Section 455(a)

*Board of School Comm'rs,* 517 F.2d 1044, 1051 (5th Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). *See also Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921) (construing a predecessor statute).

24. *Parrish v. Board of Comm'rs of Alabama State Bar,* 524 F.2d 98, 100 (5th Cir.1975) (en banc), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976) (quoting *United States v. Thompson,* 483 F.2d 527, 528 (3d Cir.1973)).

25. *See Selfridge v. Gynecol, Inc.,* 564 F.Supp. 57, 58 (D.Mass.1983) (quoting 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3551, at 374 (1975)); Hjelmfelt, *supra,* note 22, at 256.

26. *See Parrish v. Board of Comm'rs of Alabama State Bar,* 524 F.2d at 103; *United States v. Jaramillo,* 745 F.2d 1245, 1249 (9th Cir.1984), *cert. denied,* 471 U.S. 1066, 105 S.Ct. 2142, 85 L.Ed.2d 499 (1985); *Blizard v. Frechette,* 601 F.2d 1217, 1220 (1st Cir.1979).

27. *Davis v. Board of School Comm'rs,* 517 F.2d at 1051.

28. *Parrish v. Board of Comm'rs of Alabama State Bar,* 524 F.2d at 103; H.R.Rep. No. 1453, 93d Cong., 2d Sess. 5, *reprinted in* 1974 U.S.Code Cong. & Admin.News 6351, 6355.

requires a judge to disqualify himself when "his impartiality might reasonably be questioned." Thus, under § 455(a) an actual demonstrated prejudice need not exist in order for a judge to recuse himself: "disqualification should follow if the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." [29] Congress expressly intended the amended § 455 to promote public confidence in the impartiality of the courts by eliminating even the appearance of impropriety.[30] Although the courts retained the requirement that the alleged bias or prejudice "stem from an extrajudicial source" and now permitted the factual accuracy of affidavits submitted under § 455 to be scrutinized,[31] the general effect of this statute was to liberalize greatly the scope of disqualification in the federal courts.

The amended § 455 also established a number of bright line rules for disqualification. Mandatory disqualification is provided for in certain situations where the potential for conflicts of interest are readily apparent. For example, under subsection (b), a judge must disqualify himself when he has a financial interest or when a member of his family "within the third degree of relationship" is a party or lawyer in the case. The statute also states that the parties cannot waive the *per se* rules of disqualification set out in § 455(b).[32]

### 3. Discussion

■ Defendants assert a number of grounds for the disqualification of Judge Clemon. Defendants first allege in their affidavits that Judge Clemon has two minor children and thus is disqualified because these children are members of the plaintiff class. Judge Clemon proudly admits to having two children who were ages 9 and 16 at the time of appellants' motions. The class certified by the trial judge includes all children "who are eligible to attend or who will become eligible to attend the public institutions of higher education in the Montgomery, Alabama, area." Consequently, Judge Clemon's children are technically members of this class and possess an interest in the outcome of this litigation. Section 455 provides for disqualification where the judge knows that a "minor child residing in his household, has a financial interest ... or any other interest that could be substantially affected by the outcome of the proceeding" [33] or if "[h]e or his spouse, or a person within the third degree of relationship ... is a party to the proceeding." [34] Defendants argue that the trial judge should be disqualified under the terms of this provision.

We conclude that the interests of Judge Clemon's children are not "substantial" enough to merit disqualification. Any beneficial effects of this suit upon these children were remote, contingent and speculative. There is no evidence that Judge Clemon's children have any desire or inclination to attend a Montgomery area institution. Any potential interest, moreover, is shared by all young black Alabamians. "[A]n interest which a judge has in common with many others in a public matter is not sufficient to disqualify him." [35] In similar circumstances where federal judges have possessed speculative interests as

---

**29.** *Potashnick v. Port City Constr. Co.,* 609 F.2d 1101, 1111 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980).

**30.** *See* H.R.Rep. No. 1453, 93d Cong., 2d Sess. 5, *reprinted in* 1974 U.S.Code Cong. & Admin. News at 6355 (amendment to § 455 "is designed to promote public confidence in the impartiality of the judicial process").

**31.** *See, e.g., Hamm v. Members of Bd. of Regents of Florida,* 708 F.2d 647, 651 (11th Cir.1983); *Phillips v. Joint Legislative Comm.,* 637 F.2d 1014, 1019 n. 6, 1020 (5th Cir. Unit A 1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982); *In re International Business Ma-* *chines Corp.,* 618 F.2d 923, 927–29 (2d Cir.1980); *see also* 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure,* §§ 3542 & 3550.

**32.** 28 U.S.C. § 455(e). This subsection does provide for waiver of claims raised under § 455(a) after full disclosure by the trial judge.

**33.** 28 U.S.C. § 455(b)(4).

**34.** 28 U.S.C. § 455(b)(5).

**35.** *In re City of Houston,* 745 F.2d 925, 929–30 (5th Cir.1984) (quoting 48A C.J.S. *Judges* § 123 (1981)).

members of large groups, the federal courts have held these interests to be too attenuated to warrant disqualification. The courts also have concluded that no personal bias or reasonable doubt about the judge's impartiality exists in these circumstances.[36] Most significant for our decision here is the Fifth Circuit's holding in *In re City of Houston*.[37] In that case the Fifth Circuit addressed a challenge to a black judge in a voting rights action in which the judge was a class member. The court denied the motion to disqualify, ruling that the posture of the trial judge—possessing an attenuated non-pecuniary interest no different from that of the general voting public in Houston—was not what Congress intended to proscribe in drafting §§ 144 and 455. We reach the same conclusion here.

To disqualify Judge Clemon on the basis of his children's membership in the plaintiff class also would come dangerously close to holding that minority judges must disqualify themselves from all major civil rights actions. As the *In re Houston* court noted:

Many civil rights suits are brought in the form of class actions. Considering the broad declaratory and injunctive relief that federal courts are called upon to dispense, it is hard to imagine a case in which a minority judge would not have a family member within the class....[38]

To disqualify minority judges from major civil rights litigation solely because of their minority status is intolerable. This court cannot and will not countenance such a result. The recusal statutes do not contemplate such a double standard for minority judges. The fact that an individual belongs to a minority does not render one biased or prejudiced, or raise doubts about one's impartiality: "that one is black does not mean, *ipso facto*, that he is anti-white; no more than being Jewish implies being anti-Catholic, or being Catholic implies being anti-Protestant."[39] Defendants' argument cuts too broadly since every Alabama judge with children, whether members of the class or not, has an interest in the future of the state university system.[40] As Judge Higginbotham eloquently wrote:

It would be a tragic day for the nation and the judiciary if a myopic vision of the judge's role should prevail, a vision that required judges to refrain from participating in their churches, in their non-political community affairs, in their universities. So long as Jewish judges preside over matters where Jewish and Gentile litigants disagree; so long as Protestant judges preside over matters were Protestant and Catholic litigants disagree; so long as white judges preside over matters where white and black litigants disagree, I will preside over matters where black and white litigants disagree.[41]

36. In *Christiansen v. National Savings and Trust Co.*, 683 F.2d 520, 525–26 (D.C.Cir.1982), for example, the class was defined as "all federal employees who were Blue Cross and Blue Shield subscribers." There, the court held that the "interest of subscribing judges is too contingent and remote." *Id.* at 526. Trial judges also have been permitted to preside over massive antitrust suits against utility companies with whom they are customers. *In re New Mexico Natural Gas Antitrust Litigation*, 620 F.2d 794 (10th Cir.1980); *In re Virginia Elec. & Power Co.*, 539 F.2d 357 (4th Cir.1976).

37. 745 F.2d 925 (5th Cir.1984).

38. *Id.* at 930. It also is interesting to note that the class in the instant case includes "Black citizens who were, are or will become eligible to be employed by the public institutions of higher education in the Montgomery, Alabama, area." Judge Clemon therefore is arguably a member of the class and disqualified under appellants'

theory, since he could become a professor or employee at one of these institutions.

39. *Pennsylvania v. Local 542, Int'l Union of Operating Engineers*, 388 F.Supp. 155, 163 (E.D.Pa. 1974).

40. *See In re City of Houston*, 745 F.2d 925 (5th Cir.1984) (interests of all voters in Houston implicated in voting rights suit); *cf. Parrish v. Board of Comm'rs of Alabama State Bar*, 524 F.2d 98, 103 (5th Cir.1975) (en banc) (all judges in the circuit were members of segregated bar associations at one time), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).

41. *Pennsylvania v. Local 542, Int'l Union of Operating Engineers*, 388 F.Supp at 181. *See also In re City of Houston*, 745 F.2d 925 (5th Cir. 1984); *Paschall v. Mayone*, 454 F.Supp. 1289 (S.D.N.Y.1978); *Blank v. Sullivan & Cromwell*, 418 F.Supp 1 (S.D.N.Y.1975).

■ Nor can we countenance defendants' claim that Judge Clemon is prejudiced and no longer impartial by virtue of his background as a civil rights lawyer. Appellants point to Judge Clemon's representation of black plaintiffs in race discrimination actions prior to joining the bench as evidence of personal bias in this action. It is well settled that "the facts pleaded ... will not suffice to show the personal bias required by the statute if they go to the background and associations of the judge rather than to his appraisal of a party personally." [42] All judges come to the bench with a background of experiences, associations, and viewpoints. As Justice Rehnquist commented, proof that a judge's mind was a complete *tabula rasa* would be evidence of lack of qualification, not lack of bias.[43] A judge is not required to recuse himself merely because he holds and has expressed certain views on a general subject.[44] We conclude that Judge Clemon's background representing plaintiffs in civil rights actions does not warrant disqualification.[45]

Similarly, the views expressed by Judge Clemon as a political figure and member of the Alabama State Senate do not mandate disqualification.[46] As judges on this court have recognized, "[i]t appears to be an inescapable part of our system of government that judges are drawn primarily from lawyers who have participated in public and political affairs."[47] Since the funding

**42.** *Paschall v. Mayone,* 454 F.Supp. 1289 (S.D.N.Y.1978) (quoting *Pennsylvania v. Local 542, Int'l Union of Operating Engineers,* 388 F.Supp. at 159); *accord Parrish v. Board of Comm'rs of Alabama State Bar,* 524 F.2d at 101; *Home Placement Service, Inc. v. Providence Journal Co.,* 739 F.2d 671, 675 (1st Cir.1984), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 964, 83 L.Ed.2d 969 (1985); *Parker Precision Products Co. v. Metropolitan Life Ins. Co.,* 407 F.2d 1070, 1077–78 (3d Cir.1969).

**43.** *Laird v. Tatum,* 409 U.S. 824, 835, 93 S.Ct. 7, 14, 34 L.Ed.2d 50 (1972) (Rehnquist, J., mem.).

**44.** For example, Justice Rehnquist sat in *Laird v. Tatum* which he had previously discussed while testifying before Congress; Justice Frankfurter sat in labor cases despite having written extensively in the field before going to the Supreme Court; Chief Justice Hughes sat in *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), despite having written a book addressing the issue raised in the case. *See Laird v. Tatum,* 409 U.S. at 831–833, 93 S.Ct. at 11–12. It should be noted, however, that a stronger "duty to sit" may exist for Supreme Court Justices due to the potential for deadlock in the nation's highest court.

**45.** *See, e.g., Laird v. Tatum,* 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972); *Rosquist v. Soo Line Railroad,* 692 F.2d 1107, 1112 (7th Cir. 1982); *Barry v. United States,* 528 F.2d 1094 (7th Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976); *Association of Nat'l Advertisers, Inc. v. F.T.C.,* 627 F.2d 1151, 1171 n. 51 (D.C.Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980); *Idaho v. Freeman,* 507 F.Supp. 706, 728 (D.Idaho 1981); *Paschall v. Mayone,* 454 F.Supp. 1289, 1301 (S.D.N.Y.1978); *Blank v. Sullivan & Cromwell,* 418 F.Supp. 1, 4–5 (S.D.N.Y.1975); *Pennsylvania v. Local 542, Int'l Union of Operating Engineers,* 388 F.Supp. 155 (E.D.Pa.1974).

**46.** Appellants' affidavits also assert that Judge Clemon had a personal and political relationship with former Senator Donald Stewart, then counsel of record for defendant Alabama A & M. Appellants argue that this relationship raised questions about Judge Clemon's impartiality. 28 U.S.C. § 455(a). The record shows, however, that Stewart ended his representation of A & M several months before trial. The evidence also fails to demonstrate the kind of close personal ties that would affect the trial judge's judgment. *See Home Placement Service, Inc. v. Providence Journal Co.,* 739 F.2d 671 (1st Cir.1984) (judge's relationship with Senator who was responsible for his appointment did not necessitate disqualification in case involving Senator's former law firm and Senator's cousin), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 964, 83 L.Ed.2d 969 (1985); *Warner v. Global Natural Resources,* 545 F.Supp. 1298 (S.D.Ohio 1982) (judge not disqualified where plaintiff was an acquaintance who had supported his nomination to federal bench). *See also Parrish v. Board of Comm'rs of Alabama State Bar,* 524 F.2d at 102; *In re Beard,* 811 F.2d 818, 828 (4th Cir.1987); *Firnhaber v. Sensenbrenner,* 385 F.Supp. 406, 411–12 (E.D.Wis.1974); *cf. United States v. Murphy,* 768 F.2d 1518, 1537–38 (7th Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986).

**47.** *Curry v. Baker.,* No. 86–7639 (11th Cir. September 24, 1986) (Vance, J., mem.). *See also Home Placement Service, Inc. v. Providence Journal Co.,* 739 F.2d 671, 675 (1st Cir.1984) ("It is common knowledge, or at least public knowledge, that the first step to the federal bench for most judges is either a history of active partisan politics or strong political connections...."), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 964, 83 L.Ed.2d 969 (1985).

and control of public institutions in the instant case are important issues in the Alabama political arena, it is not surprising that Judge Clemon took public positions concerning these institutions prior to becoming a judge. The fact that prior to joining the bench a judge has stated strong beliefs does not indicate that he has prejudged the legal question before him. As noted above, judges have frequently heard cases concerning subjects about which they have previously expressed some views.[48]

■ Judge Clemon's involvement in the issues before this court went beyond the mere making of public statements, however. During his tenure in the state legislature, the trial judge actively participated in the very events and shaped the very facts that are at issue in this suit.[49] As chairman of the Senate Rules Committee, Judge Clemon played a critical role in the confirmation of those individuals nominated for positions on the board of trustees of the defendant institutions. Judge Clemon shaped the composition of these governing boards by acting along with other members of his committee to prevent nominations from reaching the Senate floor. For example, press accounts indicate that Judge Clemon was instrumental in preventing the confirmation of Thomas Radney to the Board of Trustees of ASU and that Judge Clemon opposed the nomination on the explicit grounds that Radney's confirmation would have created a white majority on the ASU board. Regardless of whether the specific allegation concerning the Radney nomination is true, it is clear that Judge Clemon's activities in the Senate were relevant to and plainly affected the ultimate outcome of the nomination and confirmation process for the board of trustees of the defendant institutions. Yet Judge Clemon explicitly found at trial that the composition of defendants' governing boards was a relevant and important factor in his finding of liability. In determining whether the dual system had been disestablished, "considerations of the racial identifiability of the ... governing boards are probative." His opinion examines in detail the racial composition of the board of trustees for each institution of public higher educaton in Alabama. In his examination of the composition of these governing

---

48. *See supra* notes 43–45 and accompanying text.

49. Appellees argue that this court must not consider Judge Clemon's activities as a state Senator since these facts were not presented to Judge Dyer. The question of whether considerations of timeliness apply under § 455 is a difficult one. Despite the Justice Department's recommendation, *see* H.R.Rep No. 1453, 93d Cong., 2d Sess. 9, *reprinted in* 1974 U.S.Code Cong. & Admin.News at 6358, Congress did not incorporate a time limitation into the amended statute, and courts have differed as to whether the timeliness requirement of the prior § 455 survived. *Compare, e.g., In re International Business Machines Corp.*, 618 F.2d 923 (2d Cir.1980) *with SCA Services, Inc. v. Morgan*, 557 F.2d 110 (7th Cir.1977). In *United States v. Slay*, 714 F.2d 1093 (11th Cir.1983), *cert. denied*, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984), this court applied a timeliness requirement to the disqualification claim brought under § 455(a), but not to a claim brought under § 455(b)(1). *See also* Note, *Disqualification of Federal Judges for Bias or Prejudice*, 46 U.Chi.L.Rev. 236, 265 (1978). Even if the principle of timeliness has some application to motions brought under § 455(b), it would be inappropriate to apply this principle under the circumstances of this case. Those courts that have adopted a timeliness requirement have done so "to prevent litigants from abusing motions to disqualify as dilatory tactics or as a means to 'sample the temper of the court' before deciding whether to raise an issue of disqualification." *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 503 F.Supp. 368, 381 (N.D.Ohio 1980) (quoting *United States v. Conforte*, 457 F.Supp. 641, 654 n. 7 (D.Nev.1978), *aff'd*, 624 F.2d 869 (9th Cir.) *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980)); *see also Delesdernier v. Porterie*, 666 F.2d 116, 122 n. 4 (5th Cir.), *cert. denied*, 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982). Appellants here were not acting to delay or to speculate on a favorable substantive judgment in the interim. Motions to disqualify Judge Clemon were filed at the earliest stages of the litigation and aggressively prosecuted throughout. Appellants did not discover relevant information about Judge Clemon's activities as a state legislator until late in the litigation, and raised this ground for disqualification at the first available moment. *See Miller Indus., Inc. v. Caterpillar Tractor Co.*, 516 F.Supp. 84, 89–90 (S.D.Ala.1980); *Delesdernier v. Porterie*, 666 F.2d at 122 n. 4; *Cleveland Elec. Co.*, 503 F.Supp. at 381. Given the critical importance of the appearance of impartiality guaranteed by § 455, we refuse to adopt the cramped interpretation of this statute asserted by appellees here.

boards, Judge Clemon was in part examining his own handiwork.

While in the statehouse, Judge Clemon also helped spearhead a bill to appropriate $10,000,000 to Alabama A & M. Judge Clemon cosponsored this bill which was intended to provide capital funds to improve A & M's physical plant. The stated premise of this bill was that the facilities of A & M were inferior to those of the historically white universities. Despite then Senator Clemon's best efforts to gain passage of this bill aiding A & M physical plant, the bill failed in the legislature. At trial, A & M cited the defeat of this bill as evidence of racial animus. Thus Judge Clemon was again forced to make factual findings about events in which he was an active participant. At trial, he found the "extent of renovations over the last 30 years at A & M to be wanting." Judge Clemon also detailed the poor physical conditions at A & M and found the "Alabama's choice of resource allocation for facilities for the period 1965 to 1983 significantly impaired the ability of Alabama State and A & M to attract white students." Regardless of the accuracy of these findings, Judge Clemon was making factual determinations about bills and legislative fights in which he played an active part.

The trial judge's activities as a private lawyer also involved him in the disputed evidentiary facts of this case. Judge Clemon served as an attorney of record for individual plaintiffs in the school desegregation case of *Lee v. Macon County Board of Education.*[50] Filed in 1970, *Lee v. Macon* included claims under title VI of the Civil Rights Act against many of the same institutions of higher learning as appear here. These claims took place during periods of time which are relevant to the present case under the "vestiges" theory utilized by plaintiffs. In denying the recusal motion, Judge Clemon stated that he took no part in the portion of *Lee v. Macon* involving institutions of higher education. He noted that the caption of *Lee v. Macon*

was used in many smaller actions that grew out of the original suit. According to Judge Clemon, his involvement was restricted to the representation of black high school principals in a race discrimination suit. Even this limited involvement in *Lee v. Macon,* however, left Judge Clemon with knowledge of facts that were in dispute in the instant case. The State's treatment of black high school principals during the period the trial judge represented their cause became a factual issue at trial. Plaintiff presented testimony about the long, continuous history of racially discriminatory employment practices suffered by black high school principals in Alabama. A study also was offered "for the purpose of demonstrating that there was, during the period covered [1966–1970], a decrease, substantial decrease in the number of percentage in black educators in Alabama in general and black principals in particular." Over defendants' objection, the trial judge accepted in evidence the testimony and exhibits about the status of Alabama's black high school principals. Judge Clemon admitted this evidence as relevant to prove "that as a vestige of the prior de jure system, the state enforced and pursued racially discriminatory employment practices during the period covered by the study." On this issue—whether black high school principals suffered racial discrimination— Judge Clemon was once again faced with evaluating evidence of which he had special extrajudicial knowledge.

> The language of § 455(b) is unequivocal: [A judge] shall also disqualify himself in the following circumstances:
>
> > (1) Where he has ... *personal knowledge of disputed evidentiary facts* concerning the proceeding.[51]

The Reporter's Notes to the Code of Judicial Conduct are equally clear: "The Committee also concluded that a judge cannot be, or cannot appear to be, impartial if he has personal knowledge of evidentiary facts that are in dispute."[52] Judge Clem-

---

**50.** 317 F.Supp. 103 (M.D.Ala.1970), *aff'd in part, modified in part,* 453 F.2d 524 (5th Cir.1971).

**51.** 28 U.S.C. § 455(b) (emphasis added).

**52.** Thode, Reporter's Notes to Code of Judicial Conduct, 62 (1973). Section 455(b)(1) was taken from a comparable provision of the Code of Judicial Conduct.

on's disqualification is thus mandated because of his involvement in the disputed factual issues surrounding the composition of defendants' governing boards, the legislative efforts to improve A & M's physical plant, and the State's treatment of black high school principals. Such personal knowledge vitiates the carefully constructed rules of procedure and evidence that ensure deliberate, unbiased fact finding. Litigants also are entitled to have their case decided by a judge who can approach the facts in a detached, objective fashion. Judge Clemon's partisan efforts in these disputes raise legitimate questions about his impartiality in deciding these factual matters. To permit Judge Clemon to decide a case in which he had extrajudicial, personal knowledge of disputed facts would be contrary to the express language and underlying spirit of the statute, as well as the case law.[53]

This court is not impervious to the burden that disqualification at this juncture places on the court system, the litigants, and the people of Alabama. We recognize that new proceedings before a new judge will exact a not inconsiderable cost in time, energy, and legal fees.[54] The intensity and complexity of this litigation, however, is a measure of its significance. We consider the future of higher education in Alabama too important to be decided under a cloud. In a decision such as this one, a decision which will affect millions of Alabamians, public confidence in the judicial system demands a judge free from personal knowledge or biases about the issues before the court. For this reason, we disqualify Judge Clemon and remand for a new trial.[55]

## C. Title VI Claims

The complaint of the United States asserts that this action was brought pursuant to the fourteenth amendment of the United States Constitution and title VI of the Civil Rights Act of 1964. Defendants challenge the authority of the United States to bring this suit under these provisions. Specifically, defendants argue that the Attorney General lacks the statutory authority necessary to establish standing in an action under the fourteenth amendment. Defendants also argue that the government failed to comply with the program specificity requirement of title VI when it treated the various institutions of public higher education in Alabama as part of a single system. In its brief and oral argument before

---

**53.** Courts have found recusal mandated in cases in which the judge's personal knowledge was considerably less extensive and relevant. In one particularly striking example, a judge recused himself on the basis of his activities as a state legislator forty years earlier even though he confessed that he had absolutely no recall of what actions, if any, he took. *Limeco, Inc. v. Division of Lime,* 571 F.Supp. 710 (N.D.Miss. 1983). *See also United States v. Yagid,* 528 F.2d 962, 965 (2d Cir.1976); *W. Clay Jackson Enter., Inc. v. Greyhound Leasing & Fin. Corp.,* 467 F.Supp. 801 (D.P.R.1979). *See generally Price Bros. Co. v. Philadelphia Gear Corp.,* 629 F.2d 444, 447 (6th Cir.1980.).

Appellees' reliance on Justice Rehnquist memorandum opinion in *Laird v. Tatum,* 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972), and the cases cited therein, is inapposite. Justice Rehnquist took pains to refute the allegation that he had any personal knowledge of the case. *Id.* at 827–28, 93 S.Ct. at 10. Although Justice Rehnquist and the other judges discussed in his memorandum had strong views, they did not have special knowledge of any disputed facts. It also is noteworthy that *Laird* and the cases Rehnquist discusses were decided prior to the abolition of the 'duty to sit' doctrine. *Id.* at 837, 93 S.Ct. at 14.

**54.** The trial in *Potashnick v. Port City Constr. Co.,* 609 F.2d 1101 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980), lasted thirty-three days and "spawned" a record of twenty-five volumes. Nevertheless, this circuit ruled that the trial judge should have disqualified himself and remanded for a new trial.

**55.** In remanding for a new trial, we express no opinion as to Judge Clemon's handling of the lawsuit. As the Fifth Circuit noted:

> [I]t makes no difference how much practical effect [the trial judge's recusal] would have had on the outcome of the litigation. The purpose of the disqualification statute is to avoid even the appearance of impropriety; the appearance of impropriety is not lessened by the fact that the litigation would have come out the same anyway. *Cf.* Wright & Miller, *supra,* § 3553 ("[t]here should be no room in [the recusal] context for the concept of harmless error to apply, nor for arguments to be made that in fact the judge acted in an impartial manner").

*Health Serv. Acquisition Corp. v. Liljeberg,* 796 F.2d 796 (5th Cir.1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 1368, 94 L.Ed.2d 684 (1987).

this court, the United States conceded that the Attorney General lacked the authority to proceed under the fourteenth amendment.[56] Thus the issue before this court is whether the broad systemic approach adopted by the United States is permissible under title VI of the Civil Rights Act of 1964.

■ Title VI is spending power legislation. It rests on the principle that "taxpayers' money, which is collected without discrimination, shall be spent without discrimination."[57] Title VI is a typical "contractual" spending power provision, "extending an option" to potential recipients to accept or reject federal monies depending on whether they are willing to end discrimination.[58] The precise language of title VI states:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under *any program or activity receiving Federal financial assistance.*[59]

The complaint of the United States does not specify which programs and activities within the defendant institutions receive federal funds or how these particular programs and activities are discriminatory. The government simply asserts that defendant institutions receive some federal

assistance and that the entirety of public higher education in Alabama is permeated with discrimination.[60] The United States argues that, taken together, the ten public colleges and universities along with the various state boards, commissions and officials named in the suit constitute a "program or activity receiving federal assistance." The government acknowledged at oral argument that it could cite no case law in support of its contention that independent public institutions could be merged into a single system for the purposes of title VI. According to the government, this case represented the first time that its systemic approach had reached adjudication. The United States argued that this new theory was demanded by the facts of this case—only by including often blameless individual institutions and actors can the State's violation be described and corrected.[61]

It appears to this court that the United States overstates the novelty of its attempt to satisfy title VI's requirement by defining the program as the collective "system" comprised of the various public colleges and universities, committees and officials. Rather, on closer examination, the government's argument can be seen as merely another variant on the broad "associative" theories that have been soundly repudiated by the Supreme Court and lower courts.

---

**56.** A number of courts have rejected an expansive view of the Attorney General's fourteenth amendment standing. *See, e.g., United States v. City of Philadelphia,* 644 F.2d 187 (3d Cir.1980); *United States v. Mattson,* 600 F.2d 1295 (9th Cir.1979); *United States v. Solomon,* 563 F.2d 1121 (4th Cir.1977).

**57.** 110 Cong.Rec. 7064 (1964) (statement of Sen. Ribicoff). *See also Guardians Ass'n v. Civil Serv. Comm'n of City of New York,* 463 U.S. 582, 599, 103 S.Ct. 3221, 3231, 77 L.Ed.2d 866 (1983). *Cf.* Note, *Grove City College v. Bell and Program-Specificity: Narrowing the Scope of Federal Civil Rights Statutes,* 34 Cath.U.L.Rev. 1087, 1090 n. 7 (1985).

**58.** *Guardians Ass'n,* 463 U.S. at 599, 103 S.Ct. at 3231; *United States Dept. of Transp. v. Paralyzed Veterans,* 477 U.S. 597, 106 S.Ct. 2705, 2711, 91 L.Ed.2d 494 (1986).

**59.** 42 U.S.C. § 2000d (emphasis added).

**60.** The government's statement in the pretrial order is that "defendants are recipients of substantial amounts of federal financial assistance."

**61.** The United States opines:
The University of Alabama protests that there has never been a way it could bring itself into compliance with Title VI under the government's (and apparently, the court's) theory of liability. This assumes that each of the traditionally white schools has actually been found liable under Title VI. Our principal contention ... has been that the State has caused a systemic violation. It has done so, at least in part, by favoring the traditionally white schools with money and programs. The schools are necessary parties because there is no way to describe the violation without implicating them, and no way to correct it that will fail to affect them.
*Brief of United States,* p. 68 n. 37 (citations omitted).

The United States Supreme Court decision in *Grove City College v. Bell* [62] serves as the leading case on the program-specific nature of title VI. The students at Grove City College received monies from federally funded student assistance programs. Based on the federal funding of Grove City students, the Department of Education claimed that the *entire* college must comply with title IX. Interpreting language identical to and directly modeled after that found in title VI,[63] the Supreme Court took a different tack. The Court agreed with the government that Grove City College could be considered to be "receiving Federal financial assistance" even though the funds were received by the students. The Supreme Court ruled, however, that Grove City's use of these funds did not trigger institution-wide coverage of the federal regulations. Only the specific program within the college receiving the federal assistance could be subjected to the statute. The Court rejected justifications for a broader reading of the "program or activity" requirement:

> [T]he Court of Appeals' assumption that Title IX applies to programs receiving a larger share of a school's own limited resources as a result of federal assistance earmarked for use elsewhere within the institution is inconsistent with the program-specific nature of the statute. Most federal educational assistance has economic ripple effects throughout the aided institution, and it would be difficult, if not impossible, to determine which programs or activities derive such indirect benefits. Under the Court of Appeals' theory, an entire school would be subject to Title IX merely because one of its students received a small BEOG [Basic Educational Opportunity Grant] or because one of its departments received an earmarked federal grant. This result cannot be squared with Congress' intent.[64]

Accordingly, the Supreme Court held that the only part of the college subject to the federal regulations was the college's own financial aid program.

Two terms later, the Supreme Court returned to the issue of what constituted a "program or activity receiving Federal financial assistance." In *United States Department of Transportation v. Paralyzed Veterans*,[65] the Supreme Court reaffirmed its intention to enforce strictly the program-specific nature of this language. Utilizing arguments that bear more than a passing resemblance to those of the government here, the Department of Transportation attempted to fuse airports and airlines into a single program or activity for the purposes of the statute.[66] The Supreme Court rejected the government's efforts to expand the regulations' coverage to broad concepts such as the "commercial aviation system" or the "interstate highway system." Given the United States' efforts to characterize "Alabama's public higher education system" as the relevant "program or activity," the reasoning of the *Paralyzed Veterans* Court is telling:

> The Court of Appeals found that airports and airlines are "inextricably intertwined" and that the "indissoluble nexus between them is the provision of com-

**62.** 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). This court is aware that the United States did not have guidance from *Grove City* when it filed its complaint in 1983.

**63.** Title IX of the Education Amendments of 1972 and section 504 of the Rehabilitation Act of 1973 were modeled after title VI and contain identical language. The Supreme Court has assumed the meaning of this program-specific language to be the same for all three statutes. *See, e.g., School Board v. Arline,* — U.S. —, 107 S.Ct. 1123, 1126 & n. 2, 94 L.Ed.2d 307 (1987); *United States Dept. of Transp. v. Paralyzed Veterans,* 106 S.Ct. at 2708 & n. 4, 2714; *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 636, 104 S.Ct. 1248, 1255, 79 L.Ed.2d 568 (1984); *North*

*Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 1926, 72 L.Ed.2d 299 (1982); *see also Brown v. Sibley,* 650 F.2d 760, 767–68 (5th Cir. Unit A 1981).

**64.** 465 U.S. at 572–73; 104 S.Ct. at 1221.

**65.** 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986).

**66.** The airlines were private corporations who received no federal funding. To bring the airlines under the sway of § 504, the Department of Transportation attempted to combine them with airports, since airports, receive substantial federal aid.

mercial air transportation." For these reasons, the Court of Appeals concluded that commercial airlines are part of a federally assisted program of "commercial air transportation" because they make use of airports that accept federal funds, and because airports are "indispensable" to air travel.

.        .        .        .        .

The Court of Appeals' reliance on *Grove City* in support of its definition of the relevant program or activity is misplaced. In *Grove City*, despite the arguably "indissoluble nexus" among the various departments of a small college, we concluded that only the financial aid program could be subjected to Title IX. In any analogy between *Grove City* and this case, airport operators would be placed in the position of the College. It is readily apparent that our conclusion in *Grove City* that only a portion of the College was covered by Title IX cannot support the conclusion that commercial air transportation—a concept much larger than the airports—is the program or activity covered by § 504. The Court of Appeals' attempt to fuse airports and airlines into a single program or activity is unavailing. *It is by reference to the grant statute, and not to hypothetical collective concepts like commercial aviation or interstate highway transportation, that the relevant program or activity is determined.*[67]

While the Supreme Court did not address the program-specific nature of these spending power statutes until these relatively recent decisions, this circuit has strictly enforced the "program or activity" requirement of title VI since its 1969 decision in *Board of Public Instruction v. Finch*.[68] *Finch* effectively disposes of the govern-

ment's arguments here. In *Finch*, the Department of Health, Education and Welfare found the Taylor County School Board guilty of "seeking to perpetuate the dual school system through its construction program."[69] HEW's hearing examiner and Reviewing Authority found vestiges of discrimination and entered an order to terminate "any classes of Federal financial assistance" to the Taylor County School District "arising under any Act of Congress" administered by HEW, the National Science Foundation and the Department of the Interior.[70] Neither the hearing examiner or Reviewing Authority made any finding as to the individual grants awarded the Taylor County School system or the particular programs receiving federal money. The School Board went to court to stop the cut-off of funds and argued that HEW had failed to meet the "programatic specificity" requirement of title VI. The Department responded by contending that "the term program in the statute does not refer to individual grant statutes, but to general categories such as ... school programs."[71]

Our predecessor court sided with the Taylor County School Board. In a ruling later cited with approval by the Supreme Court,[72] *Finch* held that HEW's attempt to characterize the entire school system as the relevant "program" was contrary to the legislative history of title VI. A review of the congressional debate showed that the legislators expected the statute to be applied to narrowly focused grants, referring by name to programs such as the school lunch program, the agriculture extension program for home economics teachers, aid for vocational agriculture teaching, and aid to impacted school districts. The *Finch* court concluded that Congress intended title VI to apply "to particular grant statutes

---

**67.** 106 S.Ct. at 2713–14 (citations omitted) (emphasis added).

**68.** 414 F.2d 1068 (5th Cir.1969).

**69.** *Id.* at 1071.

**70.** *Id.*

**71.** *Id.* at 1076.

**72.** In *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982), the

Supreme Court cited *Finch* with approval for the proposition that "language in §§ 601 and 602 of Title VI, virtually identical to that in §§ 901 and 902 and on which Title IX was modeled, has been interpreted as being program specific." *Id.* at 538, 102 S.Ct. at 1926. *See also* Flaccus, *Discrimination Legislation for the Handicapped: Much Ferment and the Erosion of Coverage,* 55 U.Cin.L.Rev. 81, 102–03 (1986).

..., not to a collective concept known as *a school program* or *a road program.*" [73] The court vacated the HEW order and remanded the case back to the agency for specific findings of fact as to which particular programs within the school district received federal monies and how each of these particular programs was being administered in a discriminatory manner or was being "so affected by discriminatory practices elsewhere in the school system that it thereby becomes discriminatory." [74]

Countless other courts in this and other circuits have reached the same result and have refused to permit plaintiffs to use broad concepts such as "the University of Alabama system" to circumvent the program specificity requirement of title VI. [75] This focus on the particular program receiving the federal funds has been especially strong in the higher education context. Courts have consistently held that federal aid to one area of a college or university, such as grants for academic research or new facilities or student work study, will not subject other areas of the institution to federal regulation. [76] The lack of precedential support for the government's systemic approach is not a product of the theory's innovativeness; it simply reflects the fact that this theory has been uniformly rejected by the federal courts. [77]

Title VI mandates a more rigorous analysis of the federal assistance received by defendants than was undertaken below. Under the United States' theory of the case, it was sufficient that some defendants received some federal assistance. The United States presented no evidence, and the trial court made no findings, detailing which programs and activities within these defendant institutions received federal funding. Because of this failure to identify the particular federally assisted programs being affected, the United States could not show how the actions of defendants rendered these programs discriminato-

73. 414 F.2d at 1077 (emphasis in original). *See also* Note, *The Program-Specific Reach of Title IX,* 83 Colum.L.Rev. 1210, 1228–32 (1983).

74. 414 F.2d at 1079.

75. *See, e.g., Brown v. Sibley,* 650 F.2d 760, 769–70 (5th Cir. Unit A 1981) (federal funding of organization's counseling service and warehouse construction did not subject broom production shop to § 504); *Jacobson v. Delta Airlines, Inc.,* 742 F.2d 1202 (9th Cir.1984) (federal funding of airline's small community service did not subject carrier to § 504 of Rehabilitation Act), *cert. dismissed,* 471 U.S. 1062, 105 S.Ct. 2129, 85 L.Ed.2d 493 (1985); *Foss v. City of Chicago,* 640 F.Supp. 1088 (N.D.Ill.1986) (federal funding of Chicago Fire Department's first aid training for residents, emergency preparedness and disaster services and advanced education program did not trigger application of § 504 to entire department), *aff'd,* 817 F.2d 34 (7th Cir.1987); *Chaplin v. Consolidated Edison Co.,* 628 F.Supp. 143 (S.D.N.Y.1986) (federal funding of company's special trainee employees subjects only Specialized Training Department to § 504, not entire company); *Bachman v. American Soc'y of Clinical Pathologists,* 577 F.Supp. 1257 (D.N.J.1983) (federal funding of organization's alcohol abuse activities does not subject organization's certification activities to federal regulation under § 504).

76. *See, e.g., Doyle v. University of Alabama in Birmingham,* 680 F.2d 1323 (11th Cir.1982) (federal funding of some university programs does not subject program employing plaintiff to § 504 of Rehabilitation Act); *Bennett v. West Texas State University,* 799 F.2d 155 (5th Cir. 1986) (federal funding of student service fees, work study program and federal building subsidies does not subject college's athletic program to title IX); *O'Connor v. Peru State College,* 781 F.2d 632 (8th Cir.1986) (federal funding of college's academic research and instruction did not subject college's athletic program to title IX); *Rice v. President and Fellows of Harvard College,* 663 F.2d 336 (1st Cir.1981) (federal funding of work study program did not subject the entire law school to title IX), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982); *Mabry v. State Bd. for Community Colleges,* 597 F.Supp. 1235 (D.Col.1984) (federal funding of various college activities did not subject programs taught by plaintiff to title IX where none of these programs benefited from federal aid), *aff'd on other grounds,* 813 F.2d 311 (10th Cir. 1987).

77. Appellees attempt to distinguish the line of cases rejecting a systemic approach by arguing that these cases dealt with the termination of funds. Our review of title VI's legislative history reveals no intention to apply different standards to suits to achieve compliance and those to terminate funds. Nor can we perceive any reason why the program specificity requirement of title VI should be different for compliance actions and termination actions. Both types of cases are brought pursuant to title VI, and the same program specific language should apply regardless of the remedy sought.

ry. Such detailed showings are necessary to satisfy the program specificity requirement of title VI. We thus hold that the action of the United States cannot stand as presently constituted, and its complaint and proof must be redrawn to make the requisite showings of which particular programs or activities received federal funding and . how these programs were discriminatory.

The program specificity requirement is not some pointless technical exercise. Even if the United States were ultimately able to sue many of the same defendants raising the same basic claims of discrimination,[78] a focus on how each program is discriminatory will go far to clarify this complex and often times confusing litigation. The program specificity requirement also serves to protect innocent beneficiaries of programs *not* tainted by discriminatory practices. As this court noted in *Finch*,

> If the funds provided by the grant are administered in a discriminatory manner, or if they support a program which is infected by a discriminatory environment, then termination of such funds is proper. But there will also be cases from time to time where a particular program, within a state, within a county, within a district, even within a school (in short, within a "political entity or part thereof"), is effectively insulated from otherwise unlawful activities. Congress did not intend that such a program suffer for the sins of others. HEW was denied the right to condemn programs by association. The statute prescribes a policy of disassociation of programs in the fact finding process. Each must be considered on its own merits to determine whether or not it is in compliance

with the Act. In this way the Act is shielded from a vindictive application. Schools and programs are not condemned enmasse or in gross, with the good and the bad condemned together, but the termination power reaches only those programs which would utilize federal money for unconstitutional ends. Under this procedure each program receives its own "day in court."[79]

### D. Equal Protection Claim

■ The Knight intervenors also assert a claim under title VI. Since the Knight intervenors adopted the same systemic approach as the United States, their title VI claim falls to the analysis set out above. In addition, however, the Knight intervenors in their complaint allege that their rights under the equal protection clause of the fourteenth amendment to the United States Constitution have been violated by defendants and that they therefore seek relief under 42 U.S.C. § 1983. The Knight intervenors are plainly entitled to bring a § 1983 action charging that they suffered discrimination in violation of the equal protection clause due to unequal and segregative public higher education in the Montgomery area.[80] Defendants' objections to the Knight intervenors' standing are frivolous. Contrary to defendants' contentions, the Knight intervenors are not asserting the institutional rights of ASU. The Knight intervenors are asserting their own rights as individuals who suffered racial discrimination by virtue of attending or working at an unequal, segregative institution of public higher education. The Knight intervenors are the proper party to bring this claim.[81]

---

**78.** For example, if the United States can show that a defendant institution received non-earmarked general revenue grants, the relevant "program" may include all activities receiving funds out of that general account. *See Arline v. School Bd.*, 772 F.2d 759, 763 (11th Cir.1985), *aff'd,* —— U.S. ——, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); Note, *The Program-Specific Reach of Title IX*, 83 Colum.L.Rev. 1210, 1237–40 (1983).

**79.** 414 F.2d at 1078.

**80.** *See United States v. Alabama*, 791 F.2d 1450 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987).

**81.** This court, of course, expresses no opinion as to the correctness of the class certification, the res judicata effect of *Alabama State Teachers Ass'n v. Alabama Pub. School and College Auth.*, 289 F.Supp. 784 (M.D.Ala.1968), *aff'd per curaim*, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969), or other rulings concerning the Knight intervenors' claim. We simply hold that the Knight intervenors have standing to bring this action.

## IV. CONCLUSION

That all may drink with confidence from their waters, the rivers of justice must not only be clean and pure, they must appear so to all reasonable men and women. Under the particular facts before us, the prior activities of the district judge cloud the court's impartiality and diminish its moral force. Accordingly, we REVERSE the judgment of the District Court and REMAND to the Chief Judge of the Northern District of Alabama with instructions (1) that the complaint of the United States be dismissed without prejudice, (2) that the title VI claim of the Knight intervenors be dismissed without prejudice, and (3) that the remaining claims be assigned to himself or another judge for a new trial or other proceedings [82] not inconsistent with this opinion.

82. In the event that no amended title VI claim withstands defendants' motion to dismiss, the district judge may consider whether the Knight equal protection claim can better be resolved in the Middle District of Alabama.